## FIRST NAT. BANK v. ALTON MERCAN-TILE CO. et al.

(Circuit Court of Appeals, Eighth Circuit. February 17, 1927.)

No. 7467.

**1. Principal and agent ⬅163(1)—"Ratification" is adoption by principal of voidable contract made by agent with knowledge of all material facts.**

"Ratification" is the adoption by a principal of a voidable contract made by an agent, but to be binding the principal must have full knowledge of all material facts at the time he acts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ratification.]

**2. Principal and Agent ⬅175(2)—Principal held bound by ratification of unauthorized guaranty given by agent.**

In order to obtain payment of drafts drawn by bankrupt for a large amount, its agent, without authority, gave a guaranty to the drawer to protect it from loss. Though later the agent and drawer disagreed as to the extent of the guaranty, bankrupt, with full knowledge of the claim of the drawer, ratified the agreement of its agent and retained the proceeds of the drafts. The court sustained the drawee's construction of the guaranty and rendered judgment thereon against the agent, which it paid. *Held*, that bankrupt was bound by its ratification, and that the agent had a valid claim against the estate for the amount of the judgment.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

In the matter of the Alton Mercantile Company, bankrupt. From an order allowing the claim of the Meinrath Brokerage Company, the First National Bank, an objecting creditor, appeals. Affirmed.

Harry O. Glasser, of Enid, Okl., for appellant.

B. A. Ames, of Oklahoma City, Okl. (C. B. Ames, of Oklahoma City, Okl., on the brief, and Ames, Lowe & Cochran, of Oklahoma City, Okl., of counsel), for appellees.

Before KENYON, Circuit Judge, and SYMES and MOLYNEAUX, District Judges.

SYMES, District Judge. This is the second controversy to come before this court from the Western district of Oklahoma arising out of the sale and resale of a certain consignment of sugar in April, 1920. The parties to the series of transactions in question were the Collins-Dietz-Morris Company of Oklahoma City, referred to as Collins; the Meinrath Brokerage Company, merchandise brokers, with offices in Oklahoma City and elsewhere, a claimant below, appellee here; W. H. Edgar & Son, referred to as Edgar, of Detroit, Mich.; the Alton Mercantile Company of Enid, Okl., referred to as Alton, which afterwards, but before the institution of this suit, became bankrupt, and whose side of this controversy is presented by the First National Bank of Enid, Okl., an objecting creditor, in the bankruptcy proceedings, appellant.

The first of these suits is entitled Meinrath Brokerage Co. v. Collins-Dietz-Morris Company (C. C. A.) 298 F. 377. As the cases are in some respects interdependent, we will adopt verbatim the statement of facts from that case.

"It appears that Alton had purchased from certain refiners 1,500 bags of sugar (100 pounds each), with the intention, like the other parties concerned, of reselling. On April 23, 1920, Meinrath, acting as broker, sold this sugar for Alton to Collins at 26 cents, and on the 29th of April following Collins in turn, through Meinrath, as broker, sold it to Edgar at 27 cents. It is admitted by all that the details of these sales are ordinarily handled by the broker, and these particular transactions were no exception. Accordingly Edgar directed Meinrath to have the sugar shipped in three cars, of 500 bags each, consigned to three separate destinations. These instructions were transmitted by Meinrath to Alton, but not to Collins. In due course the sugar was shipped to Edgar by the refinery, but not in accordance with the latter's instructions. This, it is admitted, gave Edgar a legal excuse for nonperformance of his contract with Collins that he promptly took advantage of.

"Alton, as was customary, drew drafts on Collins, with bills of lading attached, sending copies of the invoices to Meinrath. These were presented to Collins through a bank on June 15th. Collins gave checks in payment, and took up the drafts and bills of lading, in ignorance of the mistake made in the shipping instructions. When Meinrath received copies of the invoices, they discovered that Alton had disregarded the shipping instructions. Mr. Gillespie, a representative and employee of Meinrath, immediately called up Collins and inquired as to the point of origin of the shipment. Collins asked why this information was desired, whereupon Gillespie stated that Alton had shipped the consignment in two cars, instead of three, and had also made a mistake in destinations. He admits that he did not call Collins to inform him of the mistake. Collins immediately returned the bills of lading and drafts to the bank and received back his checks. Thereafter Meinrath tried to persuade Collins to pay the Alton drafts, assuring them that Edgar would waive the mistake and accept the shipment. This Collins declined to do, unless Meinrath would first obtain assurances from Edgar to that effect, which were not forthcoming.

"The day following Gillespie, representing Meinrath, went into conference with the Collins firm and renewed his request that they take up the Alton drafts, and according to Collins' story orally promised that if Collins would recall and pay the Alton drafts, and draw drafts with bills of lading attached on Edgar, that Meinrath would pay Collins any loss or damage they might sustain thereby. Meinrath denies that any such promise was made. Collins further states that in reliance upon this promise he thereupon paid the Alton drafts and forwarded the bills of lading to Edgar with drafts attached. A day or so later Edgar informed Meinrath that he would not pay the drafts, and on June 21st the same were duly protested. Upon learning of this, Collins notified Meinrath that they would look to them for reimbursement in accordance with their oral guaranty.

"Meinrath immediately got in touch with Edgar, and stated there had been an error in the shipment, and asked them to help them (Meinrath) out. An arrangement was thereupon entered into between them, by which Edgar was allowed to take the bills of lading from the bank, divert the cars to new destinations, unload part of the same at Detroit, and attempt to dispose of the sugar. Collins, at Meinrath's request, instructed the bank accordingly, and, further, to reduce the draft $200 to cover Alton's expenses caused by this change. This is what is known as the trust receipt agreement.

"A short time after the Detroit bank again took up the matter of payment with Edgar, who claims that immediate payment was demanded, contrary to the new understanding. Edgar refused to pay and declined to have anything more to do with the transaction. This action was based upon a letter that the Detroit bank received from its correspondent bank in Chicago, through which the drafts and bills of lading went. The evidence shows that this communication was one of inquiry only as to the status of the matter, and all the Detroit bank did was to call in Edgar's representative, who read the letter. Edgar was not justified in construing it as a demand for immediate payment. In any event, Collins was not responsible for this, and is not liable for Edgar's refusal to pay the draft. The bills of lading were thereafter returned to Meinrath, who proceeded to sell one of the two cars of sugar and remitted the proceeds to Collins, who gave him credit for the amount. The balance Meinrath stored, and as far as the record shows was never disposed of. Collins thereupon brought this suit against Meinrath on its guaranty for the loss they had sustained.

"The jury, under proper instructions, found as a matter of fact that Meinrath had made the oral promise to save Collins harmless on account of having paid the Alton

drafts, after Edgar's refusal to go ahead with the first deal."

This court affirmed the verdict, thus, in effect, sustaining the contention of Collins that the guaranty given him by Meinrath as agent of Alton was unlimited, and covered all loss that Collins might suffer as the result of paying the drafts.

Relying upon that decision, and having paid the judgment, Meinrath sought to recover from Alton the amount thereof, and filed its claim against Alton in bankruptcy for $33,787.19, the balance of the judgment, attorney's fees, and costs. The appellant here, the First National Bank of Enid, Okl., and other creditors, objected to the allowance thereof. The referee disallowed the claim, but his action was reversed, and the claim allowed by the District Court. The objecting creditor prosecutes this appeal.

It is admitted that Alton and his broker, Meinrath, took the position at all times that the telephonic conversation between Meinrath and Collins, initiated by Meinrath at the request of Alton, merely amounted to a limited guaranty to protect Collins to the extent only of all expenses incurred by them in connection with getting the sugar to the proper destination, such as expense of diversion, unloading, reshipping, etc.; so appellant here argues that, if Meinrath gave an unrestricted guaranty to Collins, as this court decided in the first case, he acted beyond the scope of his authority in so doing, and that Alton, as principal, cannot be held liable for this unauthorized act of his agent.

Meinrath says that this might be true were it not for the telephonic conversation between Alton and Gillespie, Meinrath's agent, on or about July 15th, and Alton's letter of the same date, which, according to the view of the lower court constituted a ratification and adoption of the unauthorized act, rendering the bankrupt estate liable to Meinrath for the full amount of the judgment the latter had been compelled to pay Collins. It is clear that in the first instance Alton did not authorize Meinrath to guaranty Collins against all loss, although as his counsel concedes, he knew that Collins was claiming the broad guaranty.

The record on the question of ratification is as follows:

Gillespie, Meinrath's agent, testified that later, and on or about July 15th, he called Alton on the phone and informed them that Collins' representative had just been in and advised them that the drafts Collins had drawn on Edgar had been refused, and that they (Collins) would expect them (Meinrath) to put up something like $40,000 to protect the same on their return, claiming they had guaranteed to protect them against any loss in case the drafts were dishonored; that Alton thereupon replied, in effect, that Collins had no claim against Meinrath, and that if they should attempt to hold them responsible he (Alton) would step in and defend them; "that he would see we did not lose a penny," etc. This is not denied. Gillespie was sure that he fully explained the situation before Alton made this statement. He also asked Alton to write a letter confirming this telephonic conversation, which Alton did under date of July 15th. In the letter Alton said, in part:

"The writer assured Mr. Gillespie over the telephone to-day that, if Collins attempts to hold you financially responsible in this matter, we are going to step into the breach and defend the suit. * * * You acted for us in the sale, and as our agents cannot be held liable as we view the matter. * * * Mr. Gillespie should not worry about it, because he has our assurance that we will protect you. Collins has no valid claim against us, simply because Edgar has rejected the sugar."

This communication also contained the following statement:

"The inclosed letter you can show to C. D. M. Company, but do not show them this one."

The inclosure referred to was likewise addressed to the Meinrath Brokerage Company. It discussed the situation and ended with this significant statement:

"If there is anything in connection with the sale of the sugar from us to the C. D. M. Company, by which they believe the sellers are liable, we must admit that we are the sellers, and they will have to proceed against us."

[1] Ratification, as it relates to the law of agency, is the express or implied adoption or confirmation by one person of an act or contract performed or entered into in his behalf by another, without authority. Another way of putting it is to say that it is the adoption by the principal of a voidable contract made by an agent. In order to be binding, it is necessary that the principal have full knowledge at the time he acts of all material facts. 21 R. C. L. §§ 106, 197; 2 C. J. 467, § 77 et seq., and page 476, § 93; Great Lakes Towing Co. v. Mill Transport Co. (C. C. A.) 155 F. 11, at page 21; 1 Mechem on Agency (2d Ed.) p. 288.

It would seem that the facts in the case

at bar meet these requirements. It is admitted that Alton had authorized his agent to make a limited guaranty, as a direct result of which he received payment of the drafts he drew on Collins. Later, on or about July 15th, he was fully informed of the claim Collins was making against his broker, and with that knowledge he told Meinrath he would protect them whatever the claim might be, and confirmed it in writing.

[2] But appellant argues that Alton accepted and retained the proceeds of the drafts under the belief that Gillespie had only given a limited guaranty and, further, that Meinrath seeks to hold Alton upon the theory of the ratification of an ultra vires act upon the part of Meinrath, in the face of Meinrath's denial thereof. But Alton retained the benefits after he was fully informed of the claims of the respective parties. As to the extent of the guaranty actually given Collins by Meinrath, all parties are concluded by the decision of this court in the other case, supra.

This view of the law is in accord with the equities of the situation. Alton is not entitled to the benefits of the transaction without assuming the corresponding liabilities, which this court has said were incurred when he received over $40,000 from Collins. First Nat. Bank of Muskogee v. Clark, 93 Okl. 23, 219 P. 370; 2 C. J. p. 493, § 114, and page 496, § 116. Further, both lawsuits resulted directly from Alton's default in failing to ship the sugar in accordance with the terms of the contract.

We think these views decisive on this appeal, and a discussion of the other points raised is therefore unnecessary.

The judgment of the lower court is affirmed.