**Waldemar P. THOMSON**

v.

**The UNITED STATES.**

**No. 206–61.**

United States Court of Claims.
March 18, 1966.

684

Waldemar P. Thomson, pro se.

Herbert Pittle, Washington, D. C., with whom was Asst. Atty. Gen. Edwin Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DAVIS, Judge:*

Plaintiff claims $7,125 for land appraisal services he asserts were ordered by the United States under an alleged contract. The basic issue is whether the Government, at any time, contracted for these services, and bound itself to pay the plaintiff.

In 1959, the United States Attorney's Office in Los Angeles [1] was charged with litigating two condemnation cases (C.A. Nos. 1836–ND and 1904–ND) brought to acquire land for the United States Naval Air Station at Leemore, California. An expert was needed to appraise certain of the land and property rights. Plaintiff, an experienced real estate appraiser, was recommended to the Assistant United States Attorney in charge of the land

---

* The court acknowledges the helpfulness of the findings (which we accept with minor changes) and the opinion of Trial Commissioner Franklin M. Stone. However, our conclusion with respect to plaintiff's second bid for services is at variance with the Commissioner's.

1. References to the "United States Attorney's Office", the "Office", the "United States Attorney", and "Assistant United States Attorneys" are to the Los Angeles Office (*i. e.*, the Office of the United States Attorney for the Southern District of California).

work of the Office, Mr. Albert Minton. As a result, plaintiff contacted Mr. Minton and, on January 6, 1959, met with him and another Assistant United States Attorney (Mr. H. M. Weiser), who was under Mr. Minton's supervision, to discuss the possibility of employing plaintiff to make certain appraisals and to appear as an expert in the pending condemnation proceedings. At this meeting, these men engaged in a general discussion of the appraisals, including the details of the problems to be handled by the plaintiff.

At the time of this meeting (and at all times important to this action), the authority of United States Attorneys with respect to the services of real estate appraisers (like plaintiff) was circumscribed by Department of Justice Memorandum No. 162, dated June 1, 1955. It provided that "the Lands Division appropriation will * * * be charged for services of expert witnesses, appraisers, * * *, etc. Specific authority must be obtained prior to incurring this type of expense and the vouchers forwarded to Washington as heretofore." Because of this restriction, Mr. Minton told plaintiff that no one in the United States Attorney's Office was authorized to enter into any contract for the employment of an appraiser without authority from the Department of Justice in Washington; that it would be necessary for the United States Attorney to seek, and obtain, authorization from the Attorney General before plaintiff could be employed as an appraiser; that plaintiff would have to submit a Bid for Services which would be forwarded to the Department by the United States Attorney's Office; and that plaintiff could not be notified to proceed unless his bid was accepted and authorization was issued by the Attorney General, or his delegated officer.

After this January 6th meeting the plaintiff and representatives of the United States Attorney's Office undertook to effect a contract for the needed appraisals. On January 9, Mr. Weiser, the assistant handling the two condemnation cases, wrote to Mr. Thomson that, in connection with C.A. No. 1836–ND, "I desire to obtain your opinion of fair market value as of the date of taking of said [enumerated] parcels, January 9, 1958. The parcels I should like to have you appraise are * * * [those listed below]." He also cautioned that "before I can authorize you to commence work on this project, I shall require the submission of your bid for services, which must be approved by the Attorney General." On January 16, plaintiff submitted to the United States Attorney a Bid for Services. He offered to appraise the property referred to in Mr. Weiser's letter; estimated that it would take him 60 days to complete the work; and agreed to perform at the rate of $75 per day, for a total of $4,500. The bid form provided, in part, that "The Department of Justice expects the appraisal to be completed within the estimated time", and that " * * * The estimated time must not be exceeded without prior approval of the Department of Justice, and full justification for the additional time required must be submitted." In a letter accompanying this bid, plaintiff stated that he intended to try to complete the work in 60 days and clearly indicated that he was aware of the fact that it was necessary for his "employment" to be authorized by the Department of Justice. Plaintiff's bid was forwarded to the Department, and authorization was given on February 19. The United States Attorney was notified to that effect. On March 3, Mr. Weiser informed plaintiff of such authorization by telephone and directed him to proceed with the appraisal. Plaintiff commenced his appraisal work under this bid on March 4, 1959, and completed it by June 1. He has been paid for that work.[2]

2. Following a request made of him early in July 1959 to submit a bill for services rendered through June 30, 1959, plaintiff submitted a statement, dated July 23, 1959, to the United States Attorney's Office for 60 days' appraisal services performed during the period from March 4, 1959, to June 1, 1959, inclusive, in case No. 1836–ND, totaling $4,500. This sum was paid on August 27, 1959.

Contract negotiations relating to the appraisal work for which the plaintiff now seeks to recover commenced in earnest on February 3, 1959. At that time, Mr. Weiser sent to plaintiff a second Bid for Services form and suggested that he sufficiently inform himself with respect to certain lands and property interests involved in the other suit, C.A. No. 1904–ND, to enable him to submit a bid for appraising those properties. By a letter of May 2, 1959, plaintiff returned to the United States Attorney's Office a second, completed Bid for Services. In that bid, plaintiff offered to appraise property involved in C.A. No. 1904–ND, and estimated that it would require him 95 days to complete the work. The bid provided that plaintiff would submit his appraisal within 150 days after he had been directed to proceed. While plaintiff's bid referred solely to property in case No. 1904–ND, it is apparent that plaintiff contemplated going forward and completing appraisals involved in both that case and No. 1836–ND within the estimated additional 95 days, and that defendant so interpreted plaintiff's letter.

Plaintiff's bid, which the United States Attorney considered reasonable, was forwarded to the Department of Justice on June 10, 1959. It was authorized on July 10, and the United States Attorney was thereafter notified that authorization had been given to incur the expense. However, plaintiff was never informed of such authorization, either by the United States Attorney or any member of his staff, or by the Department of Justice, or by any employee of the defendant.

Both before and after July 10, plaintiff proceeded, without word whether Washington had authorized his second bid, to perform the appraisal services called for by that proposal. He was not specifically asked to proceed nor was he told not to do the work. But, as will appear, the fair inference is that Assistant United States Attorneys did indicate the desirability of going forward and did encourage him, tacitly, to proceed. From time to time between May 2 (when he submitted his second bid) and the middle of July, he communicated with several Assistant United States Attorneys, and discussed with them appraisal matters relating to the condemnation proceedings. During that period, plaintiff also acknowledged in a letter to the Office that he had not received notice of authorization of his second bid, and stated that he was at a loss as to what to do. Following a meeting on July 16 with an Assistant United States Attorney, plaintiff wrote suggesting that efforts be made to have the Department of Justice expedite authorization of the second bid. Although the Department had already sanctioned the arrangement, plaintiff was not so told.

On July 28, 1959, Mr. Thomson transmitted to the United States Attorney a statement of appraisal "Services rendered in connection with" the two pending condemnation cases, and a bill for $4,200 (covering 56 days' work). Plaintiff did not, however, submit a formal report covering the 56 days for which he claimed compensation. On August 4, an Assistant United States Attorney wrote telling plaintiff not to render further services until directed in writing to do so. He was never given any such direction, and his claim has not been paid.[3] On these facts we must decide whether he is entitled to recover any part of the sum of $7,125 for which he now sues.

Plaintiff argues strongly—on the basis of (a) his discussions with various Assistant United States Attorneys, (b) certain correspondence between plaintiff and defendant, and (c) all of the circum-

3. In December 1959, plaintiff sent the United States Attorney a statement in the amount of $7,125 for appraisal services allegedly rendered subsequent to June 1, 1959, which bill was not paid. Thereafter, plaintiff submitted a claim in that amount to the Comptroller General who, by Settlement Certificate (dated March 4, 1960), disallowed it. Upon review and recommendation, the Comptroller General made a decision on May 17, 1960, sustaining the settlement action disallowing plaintiff's claim. On May 26, 1961, plaintiff filed his petition here.

stances surrounding the negotiations carried on by the parties—that he was justified in proceeding with the appraisal in C.A. 1836–ND immediately after his initial meeting with Mr. Minton and Mr. Weiser on January 6, 1959, and in continuing with a total appraisal in both condemnation cases, until specifically directed not to do so in August 1959. This contention is predicated primarily on Mr. Thomson's version of the January 6th meeting. He takes the position that at that conference he agreed to make the appraisal in C.A. No. 1836–ND with the clear understanding between Mr. Minton and himself that such action simply would be the initial step in a total appraisal in both cases; that after he had performed sufficient exploratory work to enable him to give an estimate of the total time required to make the appraisals in both cases, he would do so; that he would be given sufficient additional time to complete a total appraisal; and that Mr. Minton told him that the matter of obtaining authorization of his bid from Washington was merely a formality that would be granted as a matter of course.

Trial Commissioner Stone explicitly rejected this depiction of the January 6th meeting, and we certainly cannot say that he was wrong. In addition to the commissioner's opportunity to evaluate credibility, we are persuaded by the following factors. Plaintiff was an experienced real estate appraiser who had previously dealt with the United States. His first bid, submitted in January 1959, referred only to C.A. 1836–ND. In his letter of January 16, 1959, submitting that bid, plaintiff clearly acknowledged his awareness that it was necessary for his employment to be sanctioned by the Department of Justice. In fact, he did not commence his appraisal under this bid until after March 3, 1959, the date he was

notified that the bid had been authorized and that he was to proceed. Plaintiff's second bid, submitted early in May 1959, contains a detailed justification for the 95 days, in addition to the 60 days specified in his first bid, that he estimated would be required for him to complete the appraisals in both cases. Mr. Thomson's contention that he would have been justified in proceeding with all the appraisals immediately after the January 6th meeting is clearly inconsistent with these undisputed facts. Since his actual course of action deviated so markedly from his present understanding of the January 6th conference, we cannot accept his version.

Plaintiff's other position is that in his dealings with various Assistant United States Attorneys binding assurances were given and commitments made which justified his proceeding with appraisal work beyond that authorized by the first bid. The Government's two-step answer is (i) that the United States Attorney was not authorized to contract for appraisal services unless proposed bids were approved by the Attorney General; and (ii) that, even when bids were approved, it was necessary for bidders to be given explicit notice in writing [4] and to be ordered to commence work. The defendant claims that, although communication of the Attorney General's authorization (shortly after July 10) to the United States Attorney vested him with the power to notify the plaintiff to proceed, the United States Attorney could opt (as he did) to withhold such notice—and that no contract would be made unless this notice was explicitly given.

We agree that authorization by the Department of Justice to incur the expense was a necessary precondition to payment, but we cannot agree that the

---

4. At the trial, the Government asserted that it would attempt to show that "although there may be a conflict in the testimony, that the Plaintiff was informed specifically that he was to do no further work [after completion of the first bid] until he was notified in writing by the United States Attorney that authority had been obtained from Washington for the additional work." Tr. 23–4. The record does not support any requirement of a *written* notification to proceed. Plaintiff's first bid was accepted by a telephone call. Finding 5(b).

defendant escapes liability simply because the United States Attorney failed (even though Washington countenanced the arrangement) to tell the plaintiff—in terms—to proceed. In our view, (a) the United States Attorney was empowered to deal with the plaintiff and could accept the bid, subject to the Department's authorization to incur expenses; (b) the United States Attorney's acceptance could be disclosed by conduct and suggestion, as well as by specific words; and (c) in this case there was such implied acceptance through inducement and encouragement of the plaintiff to do the work.

■ First, the United States Attorney was authorized to deal with plaintiff, not merely to act as an automatic conduit for Washington. The federal district attorney's duty is to "[p]rosecute or defend, for the government, all civil actions, suits or proceedings in which the United States is concerned" (28 U.S.C. § 507(a)(2), 62 Stat. 910 (1948), as well as to render "[a]ll legal services connected with the procurement of titles to sites for public buildings", with immaterial exceptions. 40 U.S.C. § 256, 25 Stat. 941 (1889). Under these provisions, he prosecutes suits for the condemnation of lands to be used for military installations. United States v. Johnson, 173 U.S. 363, 371–377, 381, 19 S.Ct. 427, 43 L.Ed. 731 (1899);[5] United States v. Hall, 145 F.2d 781, 784 (C.A.9, 1944, cert. denied, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425 (1945); see Perry v. United States, 28 Ct.Cl. 483, 491 (1893).

Of course, the Attorney General has power to supervise "all litigation to which the United States or any agency thereof is a party and shall direct all United States attorneys, [and] Assistant United States attorneys * * * in the discharge of their respective duties." 28 U.S.C. § 507(b), 62 Stat. 910 (1948). General power is vested with him as head of the Department of Justice, (see 5 U.S.C. § 291 et seq. (1964), to "sign all requi-

sitions for the advance or payment of moneys appropriated for the Department of Justice, out of the Treasury", subject to certain limitations. 5 U.S.C. § 319, 42 Stat. 24 (1921). Moreover, he has special power to "fix the annual salaries of United States attorneys" and their assistants (28 U.S.C. § 508), to promulgate regulations governing allowance of their "necessary travel and subsistence expenses", and to authorize them to incur "necessary office expenses." 28 U.S. C. § 509; see O'Leary v. United States, 96 Ct.Cl. 237, 239 (1942). But, so far as we can tell, the Attorney General has not deprived the district attorneys of general authority to deal with potential expert condemnation witnesses like plaintiff—authority which would be inferred from the breadth of the United States Attorneys' status and responsibilities. It seems plain from the statutory scheme that these local officials can bind the United States, to the extent that the Attorney General does not limit their authority, for incidental services which "facilitate the transaction of the public business" in their offices. United States v. Denison, 80 F. 370, 372 (C.A.8, 1897); United States v. Harmon, 147 U.S. 268, 277–278, 13 S.Ct. 327, 37 L.Ed. 164 (1893).

A Department of Justice directive (Memo No. 162, June 1, 1955, supra) says that expenses for appraisers (among others) cannot be incurred without obtaining specific authorization from Washington. This order, as we read it, provides that expenses cannot be incurred and a contract cannot be finally consummated without such authorization from the central office. The United States Attorney is left, however, with authority to deal with the appraiser as to all the aspects of the contract. The terms of the agreement can be negotiated, subject always to the Department's veto over the incurring of the expense. The same is true of the work schedule and plans. We see no reason why the district attorney

---

5. Johnson, supra, is based on Revised Stat. § 771. This is now 28 U.S.C. § 507(a)(2), 62 Stat. 910 (1948), originally sec. 35 of the Judiciary Act of 1789, 1 Stat. 92 (1789).

cannot give the potential contractor leave to proceed with the work, prior to action by the Department, if the contractor is willing to undergo the risk that he will never get paid because authorization is withheld in Washington.[6] There are many instances in federal procurement in which a lower echelon official is the authorized contracting officer even though the contract may be subject to approval or veto by a higher echelon. Cf. Congress Constr. Corp. v. United States, 314 F.2d 527, 161 Ct.Cl. 50 (1963), cert. denied, 375 U.S. 817, 84 S.Ct. 53, 11 L. Ed.2d 52; Cathell v. United States, 46 Ct.Cl. 368 (1911). In such cases the contracting officer can deal with the contractor, although all may go for naught if the response of the higher level is negative. Here, that response was affirmative and finally validated the United States Attorney's actions.

 The next question is whether the Los Angeles Office ever accepted plaintiff's bid. The defendant denies this because Mr. Thomson was never specifically told to proceed with the work (even though Washington gave its authorization). It is fundamental, however, that acceptance of an offer may be manifested either expressly (as by words) or impliedly by conduct indicating assent to the proposed bargain. Restatement 2d, Contracts §§ 5, 21, 21A, 52 (Comment c) (Tent. ed. 1, 1964); I Williston, Contracts §§ 90, 91A (3d ed. 1957). The notion that assent to the terms of an agreement (i.e., acceptance)

may be evinced by action or conduct underlies the rule, repeatedly recognized by the courts, that contracts may be "implied in fact". See Baltimore & Ohio R. R. Co. v. United States, 261 U.S. 592, 597, 43 S.Ct. 425, 67 L.Ed. 816 (1923); Martin v. Campanaro, 156 F.2d 127, 130 (C.A.2, 1946), cert. denied, 329 U.S. 759, 67 S.Ct. 112, 91 L.Ed. 654. It has long been accepted that "there may be a state of facts from which an implied contract or promise to pay for services rendered may be justly inferred; and we do not doubt that in such a case, where the United States are parties defendant, the court of claims * * * [has] jurisdiction * * * to entertain a suit and render judgment." Coleman v. United States, 152 U.S. 96, 99, 14 S.Ct. 473, 474, 38 L.Ed. 368 (1894); cf. Ralston Steel Corp. v. United States, 340 F.2d 663, 668–669, 169 Ct.Cl. 119, 126–127 (1965), cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L. Ed.2d 723. We have held that the requisite assent by the offeree to a contract's terms may be overtly manifested by a course of action, and that after assent is so evidenced the United States may not assert that it is not bound (on the ground that it did not intend to contract). Goltra v. United States, 96 F.Supp. 618, 623, 625–626, 119 Ct.Cl. 217, 251–252, 254–257 (1951). If assent is thus conveyed by an authorized officer, a binding arrangement springs to life. Just as this fundamental notion supports agreements "implied in fact", so too may it be invoked to sustain express contracts

---

6. There is much in the record to indicate that both the Department (in Washington) and the Los Angeles Office considered the latter as empowered to "hire" plaintiff, rather than the Department itself as being the "employer" or contracting agency. Mr. Thomson's Bid for Services was addressed to the United States Attorney. The form request by the Office to Washington (Form 25B) is headed "Request and Authorization to Incur Expense", and requests authority from the Assistant Attorney General "to incur the expense described below." The authorization on the same form provides: "You are authorized to incur the above-mentioned expense." The letter of June 10, 1959 transmitting the bid to Washington

(finding 10(a)) refers to Mr. Thomson as being "hired *by this office*" under the earlier authorization (emphasis added). The Los Angeles Office's earlier letter of January 26, 1959 (Deft. Ex. 4), requesting authorization for Mr. Thomson's services, likewise referred to appraisers as being "hired by this office", and asked "authority to employ Mr. W. P. Thomson."

The only really contrary indication is the finding (finding 3(e)) that plaintiff admits that he was advised by Mr. Minton that all contracts for appraisal services "were made in Washington, D. C." This bit of testimony, which may merely reflect a difference in verbiage, does not persuade that the only contracting agency was the Department in Washington.

grounded on implied acceptances. Cf. Himfar v. United States, Ct.Cl., 355 F.2d 606, decided Jan. 21, 1966; Padbloc Co. v. United States, 161 Ct.Cl. 369 (1963). In this proceeding, we think that resort may properly be had to this latter principle.

■ Mr. Thomson's second Bid for Services, submitted by letter on May 2, 1959, was an offer. Where an offeree knows or has reason to know that his conduct (viewed in the circumstances of the contract negotiations, including the purpose for which an agreement is sought) may reasonably and in good faith be seen as constituting assent to the terms of the offer, an acceptance may be implied. See Baltimore & Ohio R. R. Co. v. United States, supra, 261 U.S. at 597–599, 43 S.Ct. 425; Restatement 2d, Contracts, supra, at § 21 (Comment b).[7] That is what occurred here. The attorneys in the Los Angeles Office accepted the bid through their actions, and Mr. Thomson reasonably regarded that conduct as acceptance.

Representatives of the United States Attorney made it plain in connection with both offers that plaintiff's bids were subject to the need to obtain the authorization of the Attorney General in order to incur the expense. But they did not point out that, after such authorization had been obtained, the United States Attorney in Los Angeles might still decide against employing the plaintiff or that a requirement of explicit notice of the Attorney General's authorization conditioned the conclusion of any binding arrangement. On the contrary, some of the most obvious assumptions laced through all the negotiations between the parties seem plainly to have been that the United States Attorney definitely needed plaintiff's services, that as far as his office was concerned the job of appraising the properties in question was the plaintiff's, and that he would take the steps necessary to insure (to the extent possible) that plaintiff's services would be authorized. The United States Attorney sought out the plaintiff; Mr. Weiser's initial letter (of January 9, 1959) discussed both the evaluations then needed and future evaluation problems which would be referred to the plaintiff; he later expressed hope that Mr. Thomson would "be able to undertake the appraisal shortly, so that we may have your reports by spring"; and, finally, he informed plaintiff that his second bid "appears reasonable, and this office will request authorization from the Department of Justice to employ you in accordance with the bid."

Similarly, the United States Attorney's transmittal of June 10, 1959 to the Department of Justice (requesting authorization to engage plaintiff on the second bid) indicates that the local official was concerned with speedily hiring a land appraiser (as the "District Judge, to whom these matters are presently assigned, has been pressing this office for trial dates within the near future"), and that the plaintiff was his man for the task. Since this was so, there was little reason to emphasize to plaintiff that anything more than the Attorney General's authorization was critical. There is evidence reflecting Mr. Thomson's impression that that authorization was the only substantial prerequisite to the full existence of his contract. On January 16, 1959, he had assured the United States Attorney that he would "work diligently", "if the enclosed bid is acceptable to your people in Washington * * *." On June 10, he wrote that "I have not received notice that Washington has approved your request for the additional days I require * * *." And on July 23 he added, "I shall be much obliged to you if you will contact Washington and see if it is not possible to expedite the approval of the additional time *as has been approved by your office*" (emphasis added). Significantly, the trial commissioner has found that "from time to time during the interim period" between May

---

7. It is also essential that the agents acting on behalf of the United States have authority (Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L. Ed. 10 (1947)), but, as we have already pointed out, the Los Angeles Office had that power—subject to the Attorney General's authorization to incur the expense.

2 and July 16, the "plaintiff communicated with several Assistant United States Attorneys assigned to the office of the United States Attorney in Los Angeles, and discussed with them appraisal matters relating to the two condemnation proceedings involved herein." The commissioner concluded that "a reasonable inference can be made that one or more of these Assistant United States Attorneys indicated to plaintiff the desirability of going forward with the appraisal work in order that it might be completed as soon as possible. It appears that during such discussions, plaintiff probably was tacitly encouraged to proceed with certain phases of his appraisal work." The defendant does not except to these crucial findings.

That the plaintiff proceeded with his appraisal work in these circumstances cannot be labeled unreasonable or in bad faith, even though, until the Attorney General's authorization actually issued, the work was undertaken at Mr. Thomson's own risk. Since plaintiff was reasonably sure that the Department's approval was forthcoming (he was correct on this score), he commenced work, taking the conduct of the United States Attorney's representatives as an indication of their assent to this arrangement. On the record before us, we cannot fault him for having so relied. The persons with whom he dealt surely knew that he, a businessman, was not gratuitously rendering services to the Government; they knew he expected to be paid if Washington gave its authorization; yet they did not tell him to stop working (perhaps because they, too, expected, up until the end, that he would be paid, once their

office was authorized to do so). On the contrary, the unchallenged findings show that the Los Angeles Office "indicated to plaintiff the desirability of going forward with the appraisal work in order that it might be completed as soon as possible" and "tacitly encouraged [plaintiff] to proceed with certain phases of the appraisal work." [8]

 We hold, therefore, that the direction to proceed with the work, which the Government argues was never given to Mr. Thomson, was communicated by the course of conduct of the defendant's agents, and that that direction, without more, operated to consummate a binding contract once the United States Attorney was authorized on July 10, 1959, to incur expenses and to bind the Government.[9] There was no requirement that plaintiff be informed of Washington's authorization; the giving of the authorization was enough. After the negotiations which resulted in the second Bid for Services, only two factors remained to create a valid obligation. One was the Attorney General's sanction and the other was a direction to proceed by the United States Attorney. Both were forthcoming.

To be sure, some findings suggest that Mr. Thomson may have known that, should he commence work without some express and formal notification of acceptance and direction to proceed (*after* the Attorney General's approval had issued), it would be at his own risk. See findings 3(d, e), 7. But these findings relate mainly to the initial conversations with the Los Angeles Office in January 1959 before the first bid was made. In the light of the later course of conduct, these indications lose much of their sig-

---

8. Of course, if plaintiff had been expressly and unmistakably told not to rely on anyone's conduct, the case would be different. See Coleman v. United States, supra, 152 U.S. at 99–100, 14 S.Ct. 473.

9. The fact that the Attorney General, in approving plaintiff's bid on July 10, may not have known that the United States Attorney's representatives had earlier begun to manifest assent to plaintiff's offer does not vitiate the contract. Such knowledge is needed for "ratification".

United States v. Beebe, 180 U.S. 343, 354, 21 S.Ct. 371, 45 L.Ed. 563 (1901). However, "ratification" effects a contract between the third person and the principal (here, the Attorney General) (Clews v. Jamieson, 182 U.S. 461, 481–488, 21 S.Ct. 845, 45 L.Ed. 1183 (1901); First Nat. Bank of Enid, Okl. v. Alton Mercantile Co., 18 F.2d 213, 215–216 (C.A.8, 1927); II Williston, Contracts § 278 (3d ed. 1959)), while we hold that the plaintiff contracted with the United States Attorney.

nificance. On balance, we think that the conduct of the parties working together in a common enterprise is here the most accurate measure of the defendant's assent, and of the plaintiff's reasonableness in viewing that conduct as acceptance.

■ Plaintiff is entitled to recover as damages for the defendant's breach of contract the amount stipulated in his second Bid for Services, less any appropriate reductions. See Taylor v. Tulsa Tribune Co., 136 F.2d 981, 983 (C.A.10, 1943); Gould v. McCormick, 75 Wash. 61, 134 P. 676, 679, 47 L.R.A.,N.S., 765 (1913); 5 Corbin, Contracts § 1095 at 515 (1964). Judgment is entered to that effect. The amount of recovery will be determined under Rule 47(c). We cannot now tell from the record, but appropriate offsets might include incidental costs of performance which Mr. Thomson may have saved, as well as sums which he may have earned or with reasonable diligence could have earned from other employment after his discharge. These and other offsets, if proven by the defendant (Taylor v. Tulsa Tribune Co., supra; see 5 Corbin, Contracts § 1095 at 516–19), should be taken into consideration in determining the proper amount of recovery.