WESTERN PIONEER, INC. d/b/a
Delta Western

v.

The UNITED STATES

and

Yutana Barge Lines, Inc., a subsidiary
of Brixcorp, Intervenor.

No. 240–85C.

United States Claims Court.

May 30, 1985.

Buel White, Washington, D.C., for plaintiff. Harold E. Mesirow, Barbara Morgret Campbell, and Lillick McHose & Charles, Washington, D.C., of counsel.

George M. Beasley, III, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, for defendant.

Frederick P. Hitz, Washington, D.C., for intervenor. Walter H. Evans, III, Ronald L. Winkler, Washington, D.C., Schwabe, Williamson, Wyatt, Moore & Roberts and Ragen, Roberts, O'Scannlain, Robertson & Neill, Portland, Or., of counsel.

## OPINION

MEROW, Judge:

### Introduction

In this litigation, plaintiff, Western Pioneer, Inc., d/b/a Delta Western (Delta), seeks to invoke this court's equitable pre-award contract claim jurisdiction, 28 U.S.C. § 1491(a)(3) (1982). Delta requests equitable relief precluding the transportation of certain bulk petroleum products to Galena Air Force Station, Alaska, other than in response to its April 1, 1985 proposal submitted to the Army transportation officer at Fort Richardson, Alaska. Alternatively, Delta seeks recovery of its preparation expenses.

Defendant, United States, and the intervenor, Yutana Barge Lines, Inc. (Yutana), contest the court's jurisdiction in this matter and oppose the relief sought. In the absence of disputed material facts, the issues have been placed before the court on the basis of motions filed by the parties with supporting documentation and oral argument.

### Facts

For a number of years the United States Air Force has maintained a station at Galena, Alaska. This station is the northernmost forward operations base for air defense fighter aircraft. Two aircraft are maintained at Galena on strip alert at all times and are launched frequently to intercept unknown aircraft entering the Alaskan District Early Warning Identification Zone. Galena Air Force Station is located on the north bank of the Yukon River approximately 260 nautical miles west of Fairbanks and 300 nautical miles northwest of Anchorage. No railroads or highways serve Galena. The majority of the supplies required by the station are transported by river barge during the relatively brief period from June-September when the Yukon River is free from ice and has sufficient water for navigation.

The fuel (primarily diesel and JP–4) required for operations at Galena is purchased by the Defense Fuel Supply Center (DFSC) located at Cameron Station, Alexandria, Virginia. In recent years contracts have been awarded to MAPCO for the fuel required by Galena. This fuel has been delivered to the government at a MAPCO refinery located at North Pole, Alaska.

Arranging transportation of the fuel from the MAPCO North Pole refinery to Galena has been the responsibility of the Army transportation officer (TO) at Fort Richardson, Alaska. Around the first of the year the Air Force sends Galena fuel information to the TO who would then contact the Alaska Railroad to obtain rate quotations and relevant scheduling and equipment details. The Alaska Railroad was contacted because it served the MAPCO refinery and the usual arrangement was for the fuel first to be carried by rail tank cars from the refinery to the city dock at Nenana. At this point the fuel would be transferred to a barge. Prior to 1985 the only company providing river barge service from Nenana to Galena was Yutana. Yutana and the Alaska Railroad developed joint rates which the railroad would then present to the TO at Fort Richardson. A

"Memorandum of Understanding" would then be drafted to cover the details as to Yukon River Resupply for the year concerned and this memorandum would be signed by the transportation companies and the government officials concerned.

For example, the 1984 Memorandum of Understanding contained the following provisions (in part):

Present at the Meeting of Understanding held at Headquarters, 172d Infantry Brigade (AK) 12 April 1984 were representatives of the following shipper and carrier organizations:

HQ, 172d Inf Bde (AK)

HQ, Alaskan Air Command

Defense Fuel Region, (AK)

Alaska Railroad

Yutana Barge Lines

Participants listed on page three (3) by authenticating this Memorandum agree to the following:

1. Tariffs to be used for the 1984 POL resupply of Yukon River stations are:

a. ARR Freight Tariff 8–T, Items 440 & 630, effective 8 Oct 1983

b. ICC–MJF–300–A effective 1 May 1984

2. The Alaska Railroad-Yutana River Schedule has been revised and the concept found acceptable. Shipper reserves the right to change products and destinations of individual sailings, if required. A schedule has been prepared by shipper, which will act as guide to Alaska Railroad-Yutana Barge Lines operations.

3. The equipment named by Yutana Barge Lines is the equipment to be utilized during the 1984 Resupply Program and it is understood that the equipment is in good operating condition. Coast Guard certificates covering the 1984 season will be available on or about 15 May 1984.

4. All barges that are utilized for fuel deliveries will be equipped with certified settable meter and a ticket printing device calibrated to furnish direct reading and ticket printing reflecting the volume in US Gallons delivered or transferred.

5. Control of the rail tank cars will be vested in the Transportation Officer, Fort Richardson. Release of loaded and empty tank cars, as well as spotting of cars for loading at fill stands will be effected through coordination between TO, Fort Richardson, Alaska Railroad, and PDO Personnel.

6. Yutana Barge Lines will insure rapid turn-around of all tank cars at Nenana consistent with the availability of barges. Yutana will be responsible for the release of empty tank cars to the Alaska Railroad.

7. Transportation Officer, Fort Richardson or his representatives will prepare GBL's for the rail and the river portion of the POL movement. Government Bills of Lading issued for tank cars at Fort Richardson will be consigned to Yutana Barge Lines. The River Transportation Service will be based on quantity readings of gallons loaded in barges. These readings at Nenana will be obtained from total gallonage in cars loaded to barge by using figures from GSL's/shipping documents from Fort Richardson showing gallonage in each car. If car, through leakage or other reason, has obviously less gallonage than documents indicate, Transportation Officer will be notified and joint determination of volume in car will be made. All cars will be sealed by shipper at DD Form 1149 for each tank car will be annotated as to condition at time of receipt at Nenana. This copy will be forwarded to Defense Fuel Region Alaska, Elmendorf AFB, AK 99506.

8. Quantity received at destination will be determined from the certified metering/ticket printers. In case of dispute between carrier and receiver concerning quantity discharged, such discrepancies will be reported within 24 hours. The carrier will notify TO, Fort Richardson and receiver will notify Alaskan Air Command to obtain instructions for disposition of difference. Before-and-after tank gauging (dipstick) will be jointly determined by receiving site, and the carrier's

representative (if available), correcting all volumes to 60 degrees F.

9. Government Bills of Lading issued for the river portion of POL movement may be prepared for each barge sailing or cumulative for several sailings. Yutana Barge Lines will prepare a Commercial Bill of Lading/Freight Bill to accompany each shipment. The Commercial Bill of Lading/Freight Bill will be signed by carrier and consignee and a cumulative record of actual deliveries will be maintained. Any allowance for special tolerance, based on season's delivery, will be made by consignee on carrier's commercial waybill at the time final delivery is made of each product.

    *    *    *    *    *    *

11. Yutana-Alaska Railroad agree to move the petroleum products (POL) as scheduled and that no change in product will be made for carrier's convenience except upon agreement between Transportation Officer, Fort Richardson and carriers.

12. The carriers warrant that they will deliver the military products tendered them as expeditiously as possible, taking into consideration the essential requirements of civilian consignees on the river and equipment available.

13. Yutana-Alaska Railroad agree that they will, in a timely manner, keep Transportation Officer, Fort Richardson fully informed of all operational problems throughout the shipping season.

14. Yutana Barge Lines agree to provide Transportation Officer, Fort Richardson trip reports on each trip through TELEX 26–683.

15. The Alaska Railroad will assume responsibility for adequate security to protect the contents of the tank cars from access by unauthorized persons from time of release of loaded cars to Alaska Railroad at Anchorage/North Pole until accomplishment of railroad movement. It is recognized that the Alaska Railroad/Yutana Barge Lines assumes the responsibility of complying with the environmental protection laws during the pe-riod of transportation of POL from acceptance of loaded tank cars at origin until received by consignee at destination.

16. Yutana-Alaska Railroad will allow PDO personnel access to petroleum products for testing purposes, provided necessary arrangements are made in advance with carrier.

17. Observance of proper safety measures to prevent accidents is the responsibility of carriers.

| /s/ | /s/ |
| --- | --- |
| ALASKA RAILROAD | ALASKAN AIR COMMAND |
| /s/ | /s/ |
| YUTANA BARGE LINES | HQ, 172D INF BDE (AK) (TRANS) |
| /s/ | /s/ |
| DEFENSE FUEL REGION (AK) | HQ, 172D INF BDE (AK) (PDO) |

For the 1985 Galena fuel requirements, the past procedure was followed. On January 8, 1985 the Air Force notified the Army TO that the Galena projected bulk petroleum quantities for the year were 1,500,000 gallons of diesel fuel, 1,500,000 gallons of JP–4, 60,000 gallons of motor gasoline and 20,000 gallons of propanol (a deicing substance). By letter dated January 14, 1985 the TO wrote the Alaska Railroad as follows (in part):

Attached is the breakdown of bulk petroleum products, in gallons, that are scheduled for movement from the Anchorage Petroleum Terminal and the North Pole refinery to the two Air Force sites on the Yukon River during the 1985 summer shipping season (Atch 1).

Please advise this office whether the Alaska Railroad, in conjunction with the river barge carrier from Nenana, will be capable of transporting this volume of bulk product to destinations on the Yukon River.

We also request that you submit to us at an early date your proposed operating plan for movement of this fuel, including those items listed on Atch 2. In addition to the operating plan, we request that

you attach current copies of all tariffs/tenders that will be in effect during the shipping period this cargo will be moved. Tariffs/tenders must include rail/truck/river portion, as applicable.

The conditions of delivery including the functions of the river carrier must be adhered to as stipulated in the Memorandum of Understanding which is annually concluded between the Alaska Railroad, river barge operator and the military shippers and receivers. The Memorandum of Understanding will be prepared prior to the beginning of the shipping season, and will outline the various responsibilities of the shipper, receiver and the carrier(s).

So that we may formalize plans for the 1985 season, it is requested that proposal reach us by 1 April 1985.

By letter dated January 16, 1985 the Alaska Railroad responded that it and Yutana Barge Lines would provide the transportation requested. The rate quoted was $.0501 per gallon for the rail transportation from North Pole to Nenana and $.458 per gallon for the barge trip to Galena, or a total of $.5081 per gallon.

On February 19, 1985 a representative from Delta called an official, Mr. Michaelsen, in the TO's office at Fort Richardson and expressed an interest in delivering petroleum products to Galena. In response to this inquiry, the TO sent a letter dated February 19, 1985 to Delta, substantially the same as that sent to the Alaska Railroad on January 14, 1985. This letter did note that "the product normally moves by Army owned tank cars from North Pole Refinery to Nenana."

After receipt of a revised estimate from the Air Force, Delta and the Alaska Railroad were notified, in March 1985, that JP–4 quantity was reduced from 1,500,000 to 800,000 gallons.

By a letter dated April 1, 1985, Delta wrote to the Army TO as follows:

Enclosed please find Delta Western's tender to Transport Bulk Petroleum Products from North Pole Refinery to the Air Force Site at Galena. Product is to be routed from North Pole Refinery via Tanker Trucks to the Yukon Bridge and further transshipped via tug and barge to Galena.

Attachment "A"

Reflects our operating plan showing scheduled movement of the products between the two ports.

Attachment "B"

Details the specifics of the marine equipment to be used in this operation.

Presently equipment is located in Seattle, Washington, and will be on site no later than June 14, 1985.

Delta Western will charge $.342 per gallon inclusive of all truck/river portions of transporting said fuel from North Pole Refinery to Galena Site.

Thank you for your consideration.

Sincerely,

Mike B. Tagliavento /s/

Mike B. Tagliavento
Vice President

On April 3, 1985 Delta's vice president, Mr. Tagliavento, called Mr. Michaelsen at the Army TO's office concerning the status of the tender and Mr. Michaelsen scheduled a meeting for April 12, 1985 so that Delta could explain details to the government agencies concerned. In particular, questions existed with respect to Delta's proposed use of tank trucks over unpaved roads, instead of the past practice of rail transport from the refinery, to a barge transfer site on the river. The meeting was held as scheduled with Delta providing information as to scheduling and other specifics, and confirming its $.342 per gallon rate.

Beginning in November 1984 and continuing thereafter, MAPCO and Yutana discussed the mutual benefits involved in developing a series of destination prices for MAPCO fuel along the Yukon River system. Prior to April 1, 1985 MAPCO had provided such destination prices to a number of private users along the Yukon River system served by Yutana. It was considered that this pricing method could

serve to expand the distribution of MAPCO fuel and the use of Yutana barges.

On or about April 10, 1985 the DFSC contracting officer (CO) at Cameron Station, Alexandria, Virginia, received a call from the commander, Defense Fuel Region-Alaska, reporting that he had been contacted by MAPCO regarding a change in the JP–4 and diesel fuel contract from FOB origin North Pole to FOB destination Galena. The CO then contacted MAPCO directly, noting that a change in the contract was possible only if the rate was advantageous to the government. On April 12, 1985 the CO received a letter from MAPCO proposing a change to FOB destination Galena at an additional cost of $.229 per gallon. After gaining requisite concurrences and noting that the $.229 additional fuel cost would be a saving over the $.342 rate tendered by plaintiff, the MAPCO fuel contract was, on April 22, 1985, modified to provide FOB Galena for JP–4 and diesel fuel at an additional cost of $.229 per gallon.·

By a letter dated April 19, 1985 the TO notified plaintiff of this development as follows:

Dear Mr. Tagliavento:

This is in reference to your letter of April 1, 1985 in which your firm quoted rates for transportation of petroleum products from North Pole Refinery to Galena Air Force Station. A decision has been made for procurement of the petroleum products F.O.B. Galena and therefore our transportation requirement no longer exists. Your response to our solicitation of rates is very much appreciated.

By a letter dated April 19, 1985 the TO notified Yutana as follows:

Dear Mr. Patterson:

This is to advise that a decision has been made for procurement of DFA and JP4 products F.O.B. destination Galena. Requirements remain for movement of 60,000 gallons MOGAS and 30,000 gallons PROPANOL to Galena. In addition, transportation requirements remain for movement of products to Fort Yukon.

Your Uniform Tenders, File 5 and 6 effective May 1, 1985 will be utilized for movement of above products.

The TO considered that plaintiff's $.342 tender was a package quote such that, absent the JP–4 and diesel fuel, it did not cover the remaining relatively small requirement for 60,000 gallons of motor gasoline. Because propanol had been included as part of a preexisting transportation arrangement, its listing as a requirement in this matter was in error.

Plaintiff's complaint seeking equitable relief keyed to its $.342 April 1, 1985 tender was filed in this court on April 26, 1985.

### Discussion

In the above circumstances, plaintiff asserts entitlement to provide fuel transportation to Galena to satisfy the 1985 Air Force requirements as it submitted a $.342 rate to the TO which was lower than the Alaska Railroad/Yutana submission of $.5081. Plaintiff characterizes the amendment of the MAPCO fuel contract to FOB Galena, at an additional cost of $.229 per gallon, as effectively and erroneously awarding the Galena transportation to Yutana, despite the previous higher tender Yutana had submitted directly to the TO for this work. .

Defendant and the intervenor assert that the court lacks jurisdiction over this matter. Defendant and the intervenor initially assert that plaintiff does not have a pre-award contract claim as required by 28 U.S.C. § 1491(a)(3).

█ To obtain relief under this court's equitable jurisdiction requires the existence of two contracts: (1) there must exist a "contract" to be awarded; and (2) an implied contract must be formed to have the contractor's bid or proposal fairly and honestly considered. *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir.1983). Defendant, in effect, argues that there was no contract to be awarded in this matter in that the government was only obtaining rate tenders and could subsequently issue bills of lading to any carri-

er(s) so offering service between the MAP-CO refinery and Galena. Defendant characterizes the contemplated yearly Memorandum of Understanding for Yukon River Resupply as akin to a "Basic Ordering Agreement" as defined in FAR 16.703 as follows:

16.703  Basic ordering agreements.

(a) *Description.*  A basic ordering agreement is a written instrument of understanding, negotiated between an agency, contracting activity, or contracting office and a contractor, that contains (1) terms and clauses applying to future contracts (orders) between the parties during its term, (2) a description, as specific as practicable, of supplies or services to be provided, and (3) methods for pricing, issuing, and delivering future orders under the basic ordering agreement. A basic ordering agreement is not a contract.

■ However, FAR 16.703(c) provides that "A basic ordering agreement shall not state or imply any agreement by the Government to place future contracts or orders with the contractor or be used in any manner to restrict competition." It is concluded that the Memorandum of Understanding executed each year for Yukon River Resupply, as illustrated by the 1984 example quoted previously, pp. 293–94, was not a basic ordering agreement in that it contains sufficient contractual overtones to qualify as a "contract" within the ambit of 28 U.S.C. § 1491(a)(3). This conclusion is based on the fact that the total Air Force Galena yearly transportation requirements were presented and scheduled and any change in the schedule required agreement between the TO and the carriers. The contemplated Memorandum of Understanding was, in effect, a requirements contract. No question of authority to so contract is presented as the TO had full authority to issue the bills of lading required without obtaining any additional approvals. *See Mason v. United States,* 222 Ct.Cl. 436, 615 F.2d 1343, *cert. denied,* 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980); *Inland Container, Inc. v. United States,* 206 Ct.Cl. 478, 512 F.2d 1073 (1975). After executing

the Memorandum of Understanding for the yearly Galena Resupply, utilizing another carrier could well give rise to a damage claim. *See Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756 (1982).

Given the existence of a "contract" to be awarded within the tenor of 28 U.S.C. § 1491(a)(3), the next question is whether there was an implied contract to fairly and honestly consider plaintiff's proposal. This implied contract concept had its genesis in *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409, 414 (1956), where the court ruled that "It was an implied condition of the request for offers that each of them would be honestly considered, and that that offer which in the honest opinion of the contracting officer was most advantageous to the Government would be accepted."  The *Heyer* court reasoned that "No bidder would have put out $7,000 in preparing its bid, as plaintiff says it did, if it had known the Ordnance Department had already determined to give the contract to the Weidenhoff Company." *Ibid.*  The monetary recovery specified for violation of this implied contract was a recovery of the bid preparation expenses a contractor was induced to expend by the government's request for a proposal. *Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 784, 428 F.2d 1233, 1240 (1970).

■ In 28 U.S.C. § 1491(a)(3) Congress did not provide broad "federal question" jurisdiction akin to 28 U.S.C. § 1331, which forms the basis for expanded district court consideration of procurement award controversies.  Rather, Congress limited Claims Court equitable relief to pre-award "contract" claims.  Moreover, the "contract" involved cannot be one implied-in-law.  So-called "unjust enrichment" claims are beyond the court's jurisdiction. *Sutton v. United States,* 256 U.S. 575, 581, 41 S.Ct. 563, 565, 65 L.Ed. 1099 (1921).  If the contract is to be implied, it must be implied-in-fact. *Ibid.*  An implied-in-fact contract requires an offer and acceptance. *Russell Corp. v. United States,* 210 Ct.Cl. 596, 537 F.2d 474 (1976), *cert. denied,* 429 U.S. 1073,

97 S.Ct. 811, 50 L.Ed.2d 791 (1977); *Thomson v. United States*, 174 Ct.Cl. 780, 357 F.2d 683 (1966). A contract proposal not previously requested by the government cannot fulfill the offer and acceptance requirement such as to create a "contract" requiring fair and honest consideration. Thus, to have an implied contract of fair and honest consideration requires that there initially be a request by the government for a contractual proposal. It is this request which carries the implied condition of fair and honest consideration. An unsolicited proposal submitted to the government could not produce the required implied "contract."

It is undisputed that plaintiff first approached the TO seeking consideration for the transportation to be required in the 1985 yearly Galena resupply. Had plaintiff then simply submitted its proposal for this transportation service, no implied contract for fair and honest consideration would have been formed. *See Grismac Corp. v. United States*, 214 Ct.Cl. 39, 556 F.2d 494 (1977). However, by letter dated February 19, 1985 the TO then requested that Delta submit its proposed operating plan and "tariff/tenders." The letter also noted that a "Memorandum of Understanding" would be prepared "and will outline the various responsibilities of the shipper, receiver, and the carrier(s)." As such, it is concluded that a sufficient request was made by the TO such as to form an implied contract to fairly and honestly consider Delta's responding proposal.

Defendant argues, however, that this court lacks jurisdiction because plaintiff did not file suit until after the MAPCO contract was amended to provide FOB Galena for the JP–4 and diesel fuel. As the Claims Court has only pre-award contract claim jurisdiction under 28 U.S.C. § 1491(a)(3), defendant's argument requires consideration of this court's equitable jurisdiction in the context of cancelled solicitations. There have been several rulings that the court has pre-award jurisdiction to consider the validity of cancelling a contract solicitation. *See, e.g., National Forge Co. v. United States*, 7 Cl.Ct. 530, 531 (1985);

*Aviation Enterprises, Inc. v. United States*, 8 Cl.Ct. 1 (1985). It has also been held that if a pre-award suit is filed in this court and then an award occurs, jurisdiction remains. *F. Alderete General Contractors v. United States*, 715 F.2d 1476 (Fed.Cir.1983). However, these rulings do not involve the situation where, after cancellation but prior to suit in this court, an award has been made encompassing the subject of the cancelled procurement action. It is concluded that where there has been, in fact, an award which satisfies the requirement previously solicited, it is no longer a pre-award situation. Since the MAPCO contract was amended prior to suit to encompass the transportation requirement previously solicited, any contract claim filed as to this transportation requirement is necessarily a post-award claim. Any equitable relief must be addressed to a contract which was awarded before suit was filed in this court.

■ Accordingly, as a result of the pre-suit amendment of the MAPCO contract, the Claims Court lacks jurisdiction to consider plaintiff's request for equitable relief stemming from the cancellation of the 1985 Galena resupply transportation requirements for JP–4 and diesel fuel. Plaintiff has not premised its claim on any failure to fairly or honestly consider its proposal solely with respect to the 60,000 gallons of motor gasoline not covered by the MAPCO contract amendment. In any event, it is concluded that the TO's interpretation that Delta's proposal was a "package" quote, such that it did not contemplate $.342 per gallon if the only requirement was for 60,-000 gallons of motor gasoline, was reasonable under the circumstances.

■ There remains for consideration plaintiff's alternative claim for proposal preparation expenses, keyed to the cancellation of the solicitation for its 1985 Galena transportation proposal. The procedure utilized to obtain a yearly Memorandum of Understanding for the Yukon River Resupply is more akin to negotiated procurement than to formal advertising. *Compare* FAR

14.101; FAR 15.102. No sealed bids or public bid openings were involved. There is no regulatory provision providing a higher standard than "reasonable basis" for determining the validity of the cancellation of a negotiated solicitation. *See Coastal Corp. v. United States,* 6 Cl.Ct. 337 (1984); *United States District Court for the District of Columbia,* 58 Comp.Gen. 451, 79–1 CPD ¶ 301 (1979); *Air Terminal Services, Inc. v. Department of Transportation,* 515 F.2d 1014 (D.C.Cir.1975). Plaintiff has not shown any viable basis on which the amendment of the MAPCO contract could be faulted in the factual circumstances involved. The resulting cancellation of the pending transportation solicitation was reasonable in view of the satisfaction of this requirement by the MAPCO contract. In the instant matter the amendment of the MAPCO contract to FOB Galena had a reasoned basis in the savings which accrued to the government. Absent the required showing of bad faith, or lack of a reasoned basis for the government's actions, plaintiff has not established any basis for the award of bid preparation expenses. *Aviation Enterprises, Inc. v. United States,* 8 Cl.Ct. 1 (1985).

### Conclusion

As the court lacks jurisdiction to grant equitable relief under 28 U.S.C. § 1491(a)(3) and as plaintiff has not established any basis for the award of proposal preparation expenses, it is ORDERED that defendant's motion is granted, plaintiff's motion is denied and a final judgment shall be entered dismissing the complaint.