the commercial success enjoyed by Jacobson's apparatus. Although it has been said previously, it bears repeating that the invention was made prior to the time when the problem of recovering torpedoes in deep water arose and, hence, it was not a response to a long-felt need in that field. At the time the invention was made, Jacobson's contribution, over and above the teachings of O'Rourke, consisted of his specific arrangement of cables, pulleys, and winches in an underwater-salvage device. Since, to be of value on the issue of obviousness, the commercial success must be shown to be attributable to the patentee's claimed contribution, Palmer v. United States, 182 Ct.Cl. 896 (1968), it was incumbent on plaintiffs to show that it was Jacobson's arrangement of the winches, cables, and pulleys, at least in substantial part, that made his device a success in the recovery of torpedoes. This they have failed to do. In the absence of some evidence of this character, there is as much reason to accord the commercial success to the teachings of O'Rourke incorporated in the Jacobson device as there is to attribute it to Jacobson's contribution.[8]

In summary, it is concluded that the differences between claim 1 and the prior art are such that the subject matter, when viewed as a whole in the light of all circumstances, would have been obvious to one of ordinary skill in the art.

Claims 2 and 7 add details regarding the mounting of the camera and lights and do not lend anything of patentable significance to the claimed combination. Providing an adjustable mounting for the camera so that it is capable of pan and tilt movements must, as a broad concept, be considered an obvious expedient.

Claim 6 merely specifies that at least three maneuvering lines are employed.

O'Rourke discloses the use of three cables and Romano suggests that three or four lines be used.

Claim 4 adds the limitation of a grasping mechanism for grasping an object. This too is a well-known expedient, being disclosed in Romano who employed mechanical arms on the diving bell for the purpose of grasping and lifting objects. Adding a grasping mechanism to the combination of claim 1 would have been an obvious technique for picking up objects from the ocean floor.

Having concluded that claims 1, 2, 4, 6, and 7 cannot be sustained in view of the prior art, it follows that the petition must be dismissed.

## CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.

**INLAND CONTAINER, INC.**

v.

**The UNITED STATES.**

No. 350–70.

United States Court of Claims.

March 19, 1975.

---

**8.** The evidence regarding the Navy's failures does not supply the missing link since it appears that the Navy's efforts were largely directed toward developing recovery apparatus that did not employ the rather time-consuming and laborious cable-maneuvering approach. The modified cable-maneuvering system they ultimately adopted indicates that it was the principle, not Jacobson's specific arrangement, that was critical to a successful device.

Edward M. Garrett, Salt Lake City, Utah, attorney of record, for plaintiff; Hanson & Garrett, Salt Lake City, Utah, of counsel.

Gerald L. Schrader, Washington, D. C., with, whom was Asst. Atty. Gen. Carla A. Hills, for defendant.

Before DAVIS, KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on exceptions by the parties to the recommended decision filed March 4, 1974, by Trial Judge David Schwartz, pursuant to Rule 134(h), having been submitted to the court on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is

concluded that plaintiff is entitled to recover and judgment is entered for plaintiff and against defendant in the sum of $34,831.72.

## OPINION OF TRIAL JUDGE

SCHWARTZ, Trial Judge:

This is an action for $92,570 as damages for breach by the Defense Depot at Ogden, Utah, of three contracts with plaintiff for the Depot's requirements of fiberboard shipping boxes. The claim is here found valid. Damages, held assessable under the convenience-termination clauses in the contracts, are found to be proven under the third contract only, in the amount of $34,831.72.

The Defense Depot, a facility of the Defense Supply Agency, Department of Defense, stocks and, as needed, packs and ships electronic equipment, clothing and other supplies to military installations throughout the world, primarily, at the times involved, to installations in Southeast Asia. Plaintiff is a manufacturer of corrugated fiberboard boxes, with its principal place of business in Ontario, California. Beginning in 1967 the Depot awarded to plaintiff three consecutive, annual contracts for boxes. The first contract covered only Schedules VI and VII of the invitation, the second contract only Schedule VII. In the third contract, which extended from September 1969 to September 1970, plaintiff was awarded Schedules III through VI, a substantial portion of the total invitation and a significant increase over the previous contracts.

The contracts were what is known as requirements-type contracts. The first contract obligated the Depot "to order from the contractor all of its· requirements" of the designated boxes "that may in the judgement [sic] of the contracting officer be required during the contract term." [1] The second and third contracts provided that "the Government shall order from the Contractor all the * * * [boxes] which are required to be purchased by the" Depot. [2]

Prior to the award to the third contract, Depot officers, including the contracting officer—the Depot's procurement officer for boxes—had solicited plaintiff, and other box manufacturers, to locate a branch plant near the Depot. The officers did this in the interest of promoting competition and facilitating Government orders of boxes. Plaintiff was willing, if it could get enough business from the Depot to warrant a branch plant. Accordingly, on receipt of the substantial award of the third contract, plaintiff established a second plant at Clearfield, Utah, not far from the Depot in Ogden, with the expectation that the Depot's business would carry the plant for a year and the hope that meanwhile other business would be developed.

The alleged breach resides in the practice of the Depot, throughout the three contracts, of ordering the boxes it needed from the General Services Administration, under a system to be described, before placing an order with plaintiff pursuant to the contract in force. The Depot's orders for plaintiff's boxes during the third contract amounted to $146,099; during the same period orders placed with GSA for the type of boxes covered by the contract amounted to $446,720.

The Depot-GSA relationship was unknown to plaintiff until well into the third contract, when plaintiff had al-

---

1. The first, 1967–68, contract provided:

 "THIS IS A REQUIREMENT TYPE CONTRACT FOR FIBERBOARD BOXES. THE CONTRACTOR WILL BE REQUIRED TO FURNISH THE SUPPLIES ORDERED DURING THE LIFE OF THE CONTRACT IN THE QUANTITIES ORDERED WITHIN THE LIMITATIONS SPECIFIED HEREIN. THE GOVERNMENT WILL BE OBLIGATED TO ORDER FROM THE CONTRACTOR ALL OF ITS REQUIREMENTS OF THE ITEMS PRO-VIDED HEREUNDER THAT MAY IN THE JUDGEMENT [sic] OF THE CONTRACTING OFFICER BE REQUIRED DURING THE CONTRACT TERM."

2. The second and third contracts, for 1968–69 and 1969–70, provided:

 "* * * the Government shall order from the Contractor all the supplies * * * which are required to be purchased by the Government activity identified in the 'Ordering' clause."

ready established the branch plant and saw that it was practically idle for insufficient orders. The branch plant, opened in mid-November 1969, did a gross business of $54,000, of which $35,000 was for boxes for the Depot, before it closed in March 1970, with a loss of $35,000.

It appears that GSA, and particularly GSA Denver, with which the Depot dealt, stocked not only boxes but other supplies as well for requisition by federal agencies. Specifically, GSA regularly stocked most of the boxes on the schedules of the contracts with plaintiff. Operating under requirements contracts, with box manufacturers other than plaintiff, providing for 70-day delivery, GSA ordered boxes in advance of the Depot's needs, to meet those needs. The Depot paid GSA for the boxes; the payments went into a revolving fund which financed the system, and the price was fixed so that GSA would "break even" on the operation.

GSA and the Depot had a close working relationship involving forecasts of need by the Depot, periodically updated, a computerized system at GSA which would automatically reorder boxes when stocks fell below a pre-set level and the storage of boxes in GSA warehouses until the Depot called for them. Telephone orders were placed by the Depot for boxes needed urgently and deliveries or pick-ups could be arranged by telephone on GSA or Depot trucks. In consequence, GSA could deliver boxes to the Depot with great promptness, often on the same day, from stocks kept by GSA suppliers or warehouses as near to the Depot as Clearfield. If GSA Denver was unable to meet the Depot's needs from its own stocks, it would draw on other GSA warehouses, in Texas or elsewhere.

The net result was that GSA stocked or was able promptly to provide a ready supply of most of the kinds of boxes used by the Depot. Plaintiff got the leavings, including, prominently, all of the Depot's need for special boxes, called full-flap, difficult and time-consuming to make. Almost 35 percent of the boxes ordered from plaintiff under its third contract were these full-flap boxes. GSA did not stock these boxes.

The Depot was not without some doubts over its treatment of plaintiff, though, as will appear, its officers believed they were doing the correct thing under "regulations." The contracting officer testified that at about the time of the award of the third contract it occurred to him that in the light of the Depot's practice of ordering boxes from GSA, the requirements clauses in the outstanding contracts might be confusing or misunderstood. A clause was thereupon drafted, to be added to solicitations for such contracts, stating that "boxes available from Government Agencies *will not* be ordered under this contract" [emphasis in the original].

What the effect of such a clause might have been—whether it gives sufficient notice of the practice described here—need not be decided, for the clause was not added to any of the contracts now in suit. The episode is important as tending to show some awareness by the Depot that the contract words "required to be purchased" and "required," might (as is now held) be taken to include the boxes ordered from GSA and purchased by it to meet the Depot's requirements.

As a defense to the claim of breach, the Government says, first, that the boxes were not "purchased" (a word found only in the clause in the second and third contracts, see note 2, *supra*), but requisitioned. Except for this, there is apparently no contest of the basic proposition that the language used was clear enough to create an obligation to order from plaintiff all of the Depot's requirements of boxes to be purchased. Goldwasser v. United States, 325 F.2d 722, 163 Ct.Cl. 450 (1963); Locke v. United States, 283 F.2d 521, 151 Ct.Cl. 262 (1960).

■ The contention is that boxes available on the shelves of a sister agency, when obtained by requisition, are not "purchased." This may well be so in a simple case of the reimbursable requisition of boxes originally procured by the sister agency for its own needs. Here, however, boxes were being purchased

systematically and continually, at the request of a using agency, to meet the needs of that agency. The effect was the same as if the Depot itself was purchasing in advance of requirements, to meet its requirements. The Depot was purchasing, by ordering from GSA, and GSA was, in these circumstances, the purchasing agent or arm of the Depot, engaged in regularly purchasing boxes on behalf of the Depot, to meet the Depot's requirements. Purchases, in the sense of the contract, could be said to have been made by either the Depot or GSA.

The Government emphasizes that no purchases were made to fill a specific Depot order. True, GSA made purchases only to replenish stocks and not, upon receipt of an order, to fill that order. But it makes little difference, for purposes of a contract for boxes "required to be purchased," that purchases are made in advance of the need, to provide stocks to meet needs when they arise, rather than after the need has become immediate. The boxes were still required to be purchased, and were in fact purchased, by the Depot or by its purchasing agent to meet the principal's requirements.

That the ordering paper was called a "requisition" is also immaterial. A "requisition" is an administrative name, here, for the paper transfer from an agent-purchaser to a principal-user of boxes which had already been purchased. The whole system was designed to bring about the purchase of required boxes, and the using agency paid a price which included all the elements of a purchase, including, presumably, the costs of the buying agency.

■ A next defense is based on regulations of the Defense Supply Agency, internal to the Agency and not published in the Federal Register, and a provision in the Armed Services Procurement Regulations (ASPR), published, of course, in the Federal Register, and thus binding on the plaintiff and having the force of law. Depot personnel testified that regulations of their Agency known as DSAR 4140.39, DSAM 4140.2 and DSAM 5335.1 required them to order boxes from GSA as they did, despite the contract with plaintiff; they had not heard of the regulation in ASPR. The text of the Agency regulations, without their context, was introduced in evidence. The Government in its post-trial brief recognizes that the Defense Supply Agency regulations were internal to the Agency, that is, not officially printed in any way that would give plaintiff constructive notice of them. Reliance is put on the latter two of the internal regulations, which are said to have presumably issued in implementation of the ASPR provision, and on the ASPR provision, itself.

The definitions in DSAR 4140.39, of "DSA Manager," "DSA-managed Items" and "DSA Centrally Procured Items," describe a system for procurement by a "DSA Manager" of items of supply which are "DSA-Managed." None of the regulations list or describe DSA-Managed items. A "DSA-Managed" item is "managed by the DSA Manager normally for DoD as a whole." "DSA-Managed Items" may be procured by two methods. They are "either centrally procured by the DSA Manager or are decentralized to the using Military Services for local procurement." The DSA Manager makes the decision that the item of supply shall be "centrally procured by the DSA Manager for DoD as a whole, or that the item is decentralized to the using Military Services for local procurement from the General Services Administration or commercial sources." "Local Purchase," the last of the terms defined, is said to mean: "The action of a requisitioning or using activity to purchase, for its own use or for use by supported units, items of supply authorized for local purchase from commercial sources."

This regulation, DSAR 4140.39, is entitled "Authorization for Local Purchase of DSA Centrally Procured Items." Aside from the definitions already described, it refers to the two methods of procurement of DSA-managed items—

centralized and decentralized—and with certain immaterial exceptions it authorizes two kinds of "[l]ocal purchase of any DSA centrally procured, commercial-type item": (1) to fill an emergency, immediate use requirement, and (2) where the procurement line item does not exceed $2,500.

DSAM 4140.2 and DSAM 5335.1 revise and increase to three the permitted instances of local purchase of centrally procured items as follows: (1) for emergency, immediate use, (2) where the value of the local purchase will not exceed $10, and (3) when authorized specifically by the "central item manager." DSAM 5335.1 then adds this sentence, presumably the language relied upon by the defendant: "General Services Administration (GSA) and Defense Logistics Services Center (DLSC) excess listings are a primary source of supply." The sentence plainly refers to the three kinds of authorized local purchases of centrally procured items.

The Government's contention is, apparently, that the procurement of boxes which took place in the instant case was a "local purchase," for which GSA was designated as a "primary source of supply," and that the designation prevailed despite and during the term of the contracts with plaintiff.

It is difficult to accept that the term "local purchase" could ever have included such systematic, substantial procurement of boxes as here took place under the contracts with plaintiff. For instance, at one time, at least, during the period here involved, under DSAR 4140.-39, effective June 13, 1969 (the only one of the three regulations bearing an effective date), local purchases were permitted only in emergencies and for items

whose value was not in excess of $2,500. Moreover, the term "local purchases" seems to be limited to items "centrally" procured or managed. No showing has been made that (1) boxes were a "DSA-Managed Item," (2) that they were such an item "centrally procured" or, (3) that the procurement here was a "local purchase" of a DSA-managed item, centrally procured. If, as has not been shown, fiberboard boxes were a "DSA-Managed Item," it seems most likely that the procurement of boxes by the Depot was not a local purchase of a centrally procured item but rather a "local procurement" of a "decentralized" item of supply.

The three regulations are thus not shown to be applicable to the present case. They are addressed to "local purchases" as an exception to "centralized procurement" of "DSA-Managed Items," and there has here been no proof that boxes were such items, so procured, and that the Depot's purchases were "local purchases."

The regulation published in the Federal Register, ASPR 5–201, 32 CFR § 5.201 (1969),[3] is similarly not shown to be applicable. It too relates to "local purchases"; it provides that items "decentralized for local purchase * * * will be ordered from the [GSA] Depots unless delivery requirements cannot be met." Here, again, there is no showing that the formal and very substantial procurement which took place was a "local purchase" and thus no showing that the regulation is applicable, and no need to reach questions as to the force of the regulation, were it applicable.

Another defense raised by the Government would justify orders to GSA on the ground that plaintiff frequently failed to meet the delivery-time requirements in

---

**3.** "§ 5.201 Procurement from General Services Administration stores depots.

"It is the policy of the Department of Defense that for an item which has been decentralized for local purchase and which is available from the General Services Administration stores depots, such items will be ordered from the Depots unless delivery requirements cannot be met. The mandatory provisions of Department of Defense, General Services Administration Interagency Purchase Assignments (§ 5.1201–7) are not applicable to decentralized items which are within these assignments and which are available from the stores depots. Such items will be ordered in accordance with the above stated policy. [28 F.R. 12562 Nov. 23, 1963]"

the contract—14 calendar days in the first contract and 10 working days in the second and third contracts—and that GSA had a better record in making deliveries. Plaintiff was late in delivering 75 percent of its orders. According to a rating system used by the Depot, plaintiff got "poor" and "very poor" marks for delivery more than 50 percent of the time. GSA delivered 60 percent of orders placed with it in 14 days or less; plaintiff delivered only 25 percent of its orders in that number of days.

The comparison between plaintiff and GSA in this respect is unfair. GSA had the advantage of a revolving fund which financed advance buying and warehousing of boxes until they were needed. Moreover, there is evidence that plaintiff's poor delivery record was due in substantial part to the fact that the Depot ordered from plaintiff all of its requirements of the special "full-flap" box which took more time and trouble to manufacture than regular boxes. Orders for these boxes, while within the contract, were unexpectedly large in volume and they slowed plaintiff down in making deliveries of both the special and regular boxes. Nevertheless, it does seem that plaintiff's delivery record was far from perfect, and that GSA's record was substantially better.

The contracting officer testified, in support of the defense based on delivery records, that the Depot's war-related mission was such that it could not have tolerated plaintiff's delivery record on all the boxes the Depot needed. The testimony is rejected as unconvincing. It was self-serving, given by an officer not particularly expert, and not corroborated by contemporary documents or any communication of such a view to plaintiff at the time.

Further, an exchange of letters early in the third contract, between plaintiff and the Depot's general counsel, evidences recognition by the Depot that even orders for boxes needed in 24 hours were by the contract to be offered to plaintiff. It appears that in October 1969, the Depot solicited bids on a contract for boxes to be supplied within 24 hours. Plaintiff promptly protested, citing a clause in the third contract[4] providing that orders for boxes required sooner than 10 working days must first be offered to plaintiff, and could be placed elsewhere only if plaintiff declined the business. The Depot's general counsel agreed, and replied that the invitation was designed to, and would be amended to provide only for orders of those boxes for 24-hour delivery as plaintiff first refused.

The defendant's concern over plaintiff's delays in deliveries is greater now than it was at the time. At the time, there may well have been adequate ground to terminate plaintiff for default. This, however, the Government deliberately chose not to do. The contracting officer testified that he did not terminate plaintiff's contract for the reason that the Depot could not have obtained better deliveries by going elsewhere. The Depot complained of plaintiff's deliveries only to the extent of issuing three cure notices, and in all three instances plaintiff cured the default in the time allowed. In no other way did the Government seek to urge plaintiff to make faster delivery or deliveries as required by the contract.

█ Having taken no other steps to complain or to terminate the contract at the time, the Government cannot now raise plaintiff's delay as a retroactive default to excuse its own breach. The delay was waived. *Cf.* De Vito v. United States, 413 F.2d 1147, 188 Ct.Cl. 979 (1969).

There is no valid defense to the claim of breach.

For the breach, plaintiff claims damages composed of estimated lost profits

---

4. "e. If delivery of any quantity of an item covered by the contract is required by reason of urgency prior to the earliest date that delivery may be specified under this contract and if the Contractor will not accept an order providing for the accelerated delivery, the Government may procure this requirement from another source."

under all three contracts, at 10 percent of the dollar volume of business diverted from it to GSA, and an operating loss of $34,831.72 at the Clearfield branch plant for the year of the 1969–70 contract.

█ Lost profits may not be recovered, by reason of the termination-for-convenience clause, present in all three contracts. Though the contracts were breached without reference to or reliance upon the termination-for-convenience clauses, it is settled that the clause nevertheless restricts the damages recoverable for the breach to those which would have been allowable under the convenience-termination clause, had it been invoked. Nesbitt v. United States, 345 F.2d 583, 170 Ct.Cl. 666 (1965), cert. denied, 383 U.S. 926, 86 S.Ct. 931, 15 L.Ed.2d 846 (1966); G. C. Casebolt Co. v. United States, 421 F.2d 710, 190 Ct.Cl. 783 (1970); John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964).

In Nesbitt v. United States, *supra,* the court held that even if plaintiff's contract be deemed, as alleged, to be a contract for all of the Government's requirements, the Government could still have placed orders elsewhere, on a partial termination for convenience from time to time; and that the omission to invoke the termination clause "makes no difference and that the clause nevertheless sets the limit to any possible recovery." 345 F.2d at 585, 170 Ct.Cl. at 669. The case is thus particularly apposite, for the convenience-termination clause in the contract here also permits termination "in whole, or from time to time in part." 32 CFR § 8.701(a) (1969) subparagraph (a), April 1966 text.[5]

Alleged lost profits aside, there remains the operating loss of $34,831.72 suffered by plaintiff at its Clearfield branch in the year of the third, 1969–70, contract.

By the reasoning of Nesbitt v. United States, *supra,* plaintiff is in the position as if from time to time during the third contract the Depot notified it of a partial termination to the extent of a particular order placed with GSA for boxes which should, under the contract, have been ordered from plaintiff. Such a partial termination would surely not have required plaintiff to abandon performance. The Government was in reality and in the hypothetical partial, repeated terminations, insisting upon performance by plaintiff. "Reasonable commercial judgment" required that plaintiff continue performance. Northern Helex Co. v. United States, 455 F.2d 546, 553, 197 Ct.Cl. 118, 129 (1972).

In establishing its plant at Clearfield, in preparation for the Government's orders, plaintiff is to be analogized to the contractor who buys a bulldozer to perform a Government contract which is then terminated for the Government's convenience. Appeal of Grimsrud, ASBCA 7971, 1962 BCA ¶ 3562.

The plant was established on the strength of the award of the third contract, and closed in less than 6 months, with a loss of $34,831.72 for lack of orders. It would not have been established without the contract and its promise of all the Depot's box purchases for a year. Plaintiff had no right, of course, to expect further contracts, but it could and did expect that the Government's business would enable it to break even, at the new plant, in the year of the contract; meantime other business might be found. That the expectations were not unreasonable is shown by the volume of the GSA's purchases for the use of the Depot, $466,720.98. Had this business come to plaintiff, the reasonable profit, at 10 percent, would have approximated the losses suffered.

The Government argues that since a substantial part of the $446,000 worth of

---

5. "(a) The performance of work under this contract may be terminated by the Government in accordance with this clause in whole, or from time to time in part, whenever the Contracting Officer shall determine that such termination is in the best interests of the Government. Any such termination shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract is terminated, and the date upon which such termination becomes effective."

boxes was ordered in the first 2 months of the contract, before the Clearfield plant became operational in mid-November, 1969, the arithmetic of hypothetical profit for the Clearfield plant shows that it would have lost $2,000 even had it received the business diverted to GSA. Perhaps so, but with the larger volume of business, the plant would not have closed in March 1970, when it did, and in the months following March might well have netted $2,000 and more from private business. Such *de minimus* calculations as the Government relies upon are beside the point—which is that the plant was established—reasonably so and at the urging of the Government—in preparation for the performance of the work under the contract. In consequence, when the plant was forced to close in 6 months, for lack of Government orders, in breach of the contract, its operating loss is a fair approximation of the "initial costs and preparatory expense," within the meaning of the convenience-termination clause.[6] The result is no more a penalty or damages for a tort or for consequential damages than any conventional award of out-of-pocket losses for breach of contract or an allowance, in an administrative termination settlement, of substantial preparatory costs, economically wasted by reason of an early convenience termination.

It is immaterial to the stated result that such orders as were placed were communicated to plaintiff's main plant at Ontario, California, and that $70,000 of the $106,000 in orders placed after the Clearfield plant became operational were in fact filled at the Ontario plant. The loss at Clearfield was hardly deliberate or self-inflicted to buttress the case for breach. Plaintiff doubtless planned to fill some orders at its main plant, and it cannot be expected that the main plant should have been entirely deprived of what business there was, in favor of the new branch plant. Had the Depot ordered from plaintiff the boxes it required, the additional orders would doubtless have been filled at Clearfield.

It may be said that the analogy to Appeal of Grimsrud, *supra,* is not entirely apt, that the equation of the operating loss with allowable "preparatory expense" is not exact, or that some more refined basis exists for computing plaintiff's "preparatory expense." The answer to such doubts can only be that the use of the amount of the operating loss as a measure of initial costs and preparatory expense is a reasonable and the best possible method for computing damages, on the limited record presented. As such, it is sufficient basis for a verdict. It is difficult and perhaps impossible to apply the allowable-costs convenience-termination rules literally in judicial proceedings for a determination of breach-of-contract damages. Analogies must be used, and leeway allowed to absorb the strains inevitable in a judicial inquest into damages under a set of rules written for an administrative negotiation. G. L. Christian & Associates v. United States, 312 F.2d 418, 427, 160 Ct.Cl. 1, 17, rehearing denied, 320 F.2d 345, 160 Ct.Cl. 58, cert. denied, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963), rehearing denied, 376 U.S. 929, 84 S.Ct. 657, 11 L.Ed.2d 627, 377 U.S. 1010, 84 S.Ct. 1906, 12 L.Ed.2d 1059 (1964), 170 Ct.Cl. 902, cert. denied, 382 U.S. 821 (1965); Manloading & Management Associates, Inc. v. United States, 461 F.2d 1299, 198 Ct.Cl. 628 (1972), 203 Ct.Cl. 725 (1973). Especially is this so in the unusual case presented in which the preparatory expenses are not the costs of preliminary work on a single job in an existing and continuing plant, but the losses suffered when a whole plant is established to perform one piece of work and closes with a loss when the work is not forthcoming.

---

**6.** 32 CFR § 8.701(a) (1969) subparagraph (e)(ii)(A), April 1966 ed. provides as follows:
　　"(ii) The total of—
　　"(A) The costs incurred in the performance of the work terminated, including initial costs and preparatory expense allocable thereto, but exclusive of any costs attributable to supplies paid or to be paid for under paragraph (e)(i) hereof;"

 This is still a breach of contract case, though damages are to be determined under the convenience-termination clause. In estimating damages, this court "occupies the position of a jury under like circumstances." Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 573, 174 Ct.Cl. 153, 184 (1966). Judgment against a liable defendant for damages suffered is not to be withheld for inability to compute the damages precisely; mathematical precision is not essential to the determination. Eastman Co. v. Southern Photo Co., 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Brand Investment Co. v. United States, 58 F.Supp. 749, 102 Ct.Cl. 40, 44, (1944), cert. denied, 324 U.S. 850, 65 S.Ct. 684, 89 L.Ed. 1410 (1945). In the absence of a more reliable method of determining damages, the amount of the verdict in a bench trial, whether comprising "initial costs and preparatory expense" or more traditional elements of damages, may, therefore, be as unarticulated—as approximate or, even, as subjective—as a verdict by a jury.

 On these principles it is concluded that $34,831.72, the amount of the first year operating loss at the Clearfield plant, is a "fair and reasonable approximation" of the damages, such as a termination settlement officer might allow, or, if not, then in any event such as a jury might award. Specialty Assembling & Packing Co. v. United States, *supra*; *cf.* W. R. B. Corp. v. United States, 183 Ct.Cl. 409, 425 (1968).

Plaintiff is entitled to recover $34,831.72.

**EVERETT PLYWOOD CORPORATION**

v.

**The UNITED STATES.**

**No. 743–71.**

United States Court of Claims.

Feb. 19, 1975.

