**AR SALES CO., INC., d/b/a A.R. Contacting [1] Company, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 00–71C.

United States Court of Federal Claims.

June 22, 2001.

---

1. This caption reflects the misspelling of the con-

tractor's name in the complaint. In the contract,

Paul E. Loomie, New York, for plaintiff.

James C. Caine, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With him on the briefs were Stuart E. Schiffer, Acting Assistant Attorney General, David M. Cohen, Director, and Donald E. Kinner, Assistant Director.

## OPINION

BRUGGINK, Judge.

This action arises out of a construction contract in which plaintiff was terminated for default. It is brought under the Contract Disputes Act of 1978, *as amended,* 41 U.S.C. §§ 601–613 (1994). Plaintiff seeks damages and conversion of the termination for default into a termination for convenience. Pending are the parties' cross-motions for summary judgment, defendant's alternative Motion for Partial Summary Judgment, and defendant's alternative Motion to Dismiss Count II of the Complaint. For the reasons set forth below, plaintiff's Motion for Summary Judgment is

the contractor is identified as A.R. Sales Co., Inc., d/b/a A.R. Contracting Co.

denied, and defendant's alternative Motion to Dismiss Count II of the Complaint is granted. Defendant's Motion for Summary Judgment and alternative Motion for Partial Summary Judgment remain pending.

## BACKGROUND [2]

Plaintiff is a minority-owned general contracting business. On June 5, 1997, pursuant to the § 8(a) program [3] of the Small Business Administration ("SBA"), the SBA proposed plaintiff to the Department of the Army ("Army") as the SBA's subcontractor to perform a contract to repair the sewer system of the Lee Area Family Housing complex at the United States Military Academy in West Point, New York.

As part of the solicitation and award process, the Army investigated plaintiff's financial status. The results of this investigation raised concerns about plaintiff's responsibility. These concerns were presented to the SBA in a letter dated September 22, 1997. The SBA responded in a letter dated September 24, 1997, advising the Army that "A.R. Contracting Co. w[ould] enter into a Teaming Agreement with Regis Contracting for the purposes of performing this project." [4] This letter identified Regis Contracting ("Regis") as a "Graduate 8(a) Firm that h[ad] the experience and expertise in performing this type of work." In response to the SBA's letter, the Army found plaintiff to be a responsible contractor and, on Septem-

ber 30, 1997, awarded the contract to plaintiff as the § 8(a) contractor. Regis was plaintiff's subcontractor.

The contract price was $1,582,500.25. The contract contained several clauses that are set forth in the Federal Acquisition Regulations System ("FAR").[5] We quote here those FAR clauses that are relevant to our discussion. FAR 52.249–10, Default (Fixed–Price Construction), in pertinent part, stated:

(a) If the Contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete the work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.

. . . .

(c) If, after termination of the Contractor's right to proceed, it is determined that the Contractor was not in default, or that the delay was excusable, the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government.

In addition, the contract contained standard provisions with respect to termination for convenience (FAR 52.249–2 I); the com-

---

2. The facts are not fully developed in the cross-motions. We state only the undisputed facts and note any disputed facts. Furthermore, in its reply brief, plaintiff argues that defendant's "unsupported factual representations are to be disregarded" because defendant submitted no "affidavit, or otherwise certified statement, or other proof as listed in Appendix 'H' of the [Rules of the Court of Federal Claims] regarding factual representations made in opposition to Plaintiff's Cross Motion or ... in support of Defendant's motion for summary judgment." Pl.'s Reply to Def.'s Answer in Opp'n to Pl.'s Cross Motion for Summ.J. at 2. However, in its briefs, defendant has relied on plaintiff's and its own appendices which both contain documents the admissibility of which plaintiff has not disputed. Consequently, defendant has satisfied the requirements of Appendix H which allows parties to rely on "evidence that would be admissible at trial." RCFC App. H(1)(e).

3. Under the § 8(a) program, certain government contracts are set aside for award to the SBA which then awards a subcontract to small businesses owned by socially and economically disadvantaged individuals who then perform the contract. See 15 U.S.C. § 637(a) (1994). Nominally, the contracting party is the SBA. In fact, it is the small business. See Sec. Bank & Trust Co. v. United States, 731 F.2d 861, 862 (Fed.Cir. 1984).

4. Plaintiff and Regis had signed the teaming agreement on September 23, 1997. The teaming agreement required plaintiff to perform at least thirty-five percent of the work to be performed under the contract with the Army.

5. The FAR is codified at Title 48 of the Code of Federal Regulations. The relevant provisions are quoted as they appear in the contract documents contained in the appendices submitted by the parties.

mencement, prosecution, and completion of work (FAR 52.211–10); payments under fixed-price construction contracts (FAR 52.232–5); schedules for construction contracts (FAR 52.236–15); and liquidated damages (FAR 52.212–5). Finally, the contract included Department of Defense Supplement to the FAR ("DFAR") 252.227–7003, Termination, which stated:

> Notwithstanding any other provision of this contract, the Government shall have the right to terminate the within license, in whole or in part, by giving the Contractor not less than thirty (30) days notice in writing of the date such termination is to be effective; provided, however, that such termination shall not affect the obligation of the Government to pay royalties which have accrued prior to the effective date of such termination.

Almost from the moment the contract was signed, difficulties arose. Not until December 15, 1997, after problems regarding payment and performance bonds and proof of insurance were resolved, did the Army issue a Notice to Proceed ("NTP") to plaintiff. The NTP required plaintiff to complete the contract by June 19, 1998.[6] It also required that an Accident Prevention Plan ("Safety Plan") and a Quality Control Plan ("Quality Plan") be submitted "before commencement of work."

Under its teaming agreement with plaintiff, Regis was supposed to prepare the Safety Plan and the Quality Plan required by the NTP. On December 19, 1997, and January 5, 1998, plaintiff requested that Regis provide these plans to the Army. As of the beginning of February 1998, Regis had not.

On February 3, 1998, the parties met to discuss progress. The Army was concerned that it had not yet received the Safety Plan, the Quality Plan, or a progress schedule. In response, plaintiff committed to sending, via express mail and by February 5, the requested plans and preliminary progress schedule.

The current record indicates that plaintiff did not honor its commitment. Plaintiff alleges that defendant received the Safety Plan and the Quality Plan in mid-March. Pl.'s Proposed Findings ¶ 35.[7] Furthermore, plaintiff has offered no proposed finding indicating that a progress schedule was submitted to the Army before September 15, 1998. Instead, it alleges that, at a pre-construction conference held on February 10, 1998, plaintiff was directed not to perform any work under the contract until after the Contractor Quality Control Mutual Understanding Meeting. Pl.'s Proposed Findings ¶ 32. To support its contention, plaintiff offers a document alleged to be a pre-construction outline executed by the parties. Defendant disputes this contention, pointing out that the referenced document is not dated and that it is unclear what meeting is referred to, when the document was executed, and who was in attendance at the alleged meeting. In any event, it is undisputed that the Mutual Understanding Meeting was held on April 6, 1998.

An additional difficulty arose in mid-March 1998. On March 18, plaintiff informed the Army that it could not begin performing because the Army had not yet identified an area for plaintiff to set up its construction trailer. It is unclear from the record how this problem was resolved.

Throughout the spring and summer of 1998, the parties continued to experience problems. On June 30, the Army notified plaintiff that the restoration of grassy areas after excavation was not being performed in a timely or satisfactory manner. On July 23, the parties met at the job site. At that meeting, several items of concern regarding plaintiff's performance were discussed. These included the following: (1) plaintiff's safety record;[8] (2) the filing of an inaccurate accident report; (3) plaintiff's management

---

**6.** The contract itself was somewhat unclear as to when completion was required. The government later acknowledged plaintiff's contention that the contract completion date was August 31, 1998.

**7.** Defendant disputes that these plans were received in mid-March but has not suggested an

alternative date. However, it is undisputed that the Quality Plan was approved on April 6, 1998.

**8.** Safety concerns discussed included an accident on June 24, 1998, an unsafe excavation operation on July 1, 1998, and a list of continuing safety deficiencies.

of its subcontractors;[9] (4) the passage of a three-week period after the excavation subcontractor had been on-site; and (5) plaintiff's failure to submit weekly schedules that it had earlier promised to submit. Also on July 23, 1998, plaintiff submitted a letter to the Army that stated: "Following our discussion with Mr. Pavone [the Project Engineer] we hereby, prepare a list of items that may be deducted/added to the contract." The letter then listed several potential deductions and additions. It is not clear what the letter referred to or whether it contemplated a formal response by the Army.[10]

In a letter dated August 18, 1998, the Army notified plaintiff that, because one of its subcontractors had not complied with established safety procedures, an emergency requiring an unplanned excavation to retrieve a video camera from the sewer main had arisen. Plaintiff directed its subcontractor Regis to respond to this letter. After receiving further complaints from the Army, however, plaintiff issued a cure notice to Regis regarding several areas of performance. On October 8, 1998, plaintiff terminated Regis for default as a subcontractor.

In the meantime, plaintiff's difficulties with the Army continued. On August 31, 1998, the Army informed plaintiff of additional unsafe excavation procedures and requested that plaintiff submit, by September 2, 1998, a plan for correcting safety deficiencies. The record does not indicate whether plaintiff submitted this plan in accordance with the Army's request. The record does, however, contain a document alleged by plaintiff to be a revised project schedule that was submitted to the Army on September 15, 1998. This alleged revised schedule contemplated a completion date of November 30, 1998. This schedule is not referenced in any other documentation in the record although defendant

has acknowledged that plaintiff "does appear to have provided a revised project schedule on September 15, 1998." Def.'s Opp'n to Pl.'s Cross Mot. for Summ.J. at 8.

The parties met on September 17, 1998. At this meeting, the Army provided plaintiff with an agenda that consisted of the Army's concerns with plaintiff's performance. These included (1) whether plaintiff, as it had certified, was paying its subcontractors out of the progress payments and (2) whether the work was progressing as it should. Plaintiff asked for time to prepare a formal response to these concerns. The Army requested that this response be provided by September 22, 1998.

As of September 28, 1998, the Army had not received plaintiff's response to the September 17 agenda items. In its letter of September 28, the Army noted that it still had not received a revised progress schedule.[11] The Army requested that this revised schedule be submitted no later than October 2, 1998. Also in its September 28 letter, the Army notified plaintiff that, prior to receipt of progress payment number five, plaintiff would need to ensure that all payments to subcontractors had been made in accordance with plaintiff's certification.

The Army sent plaintiff another letter on September 29, 1998. This letter informed plaintiff that the Army was concerned about completion of the drainage trough and related work required by the contract and also requested a revised progress schedule "for the completion of the entire project." Further, the letter advised plaintiff that "the Government intends to withhold funds on your future payment requests to offset the potential for liquidated damages."

The Army sent another letter to plaintiff on October 13, 1998, containing concerns

---

9. The Army alleged that plaintiff's poor management of its subcontractors had resulted in a lack of progress on the project.

10. In other correspondence we will later discuss, the Army stated that this July 23, 1998, letter was submitted at the request of the government in order to clarify questions plaintiff had about the project. The Army also later stated that the project engineer had understood that the issues raised in the letter would be discussed in the

field prior to a written response by the government.

11. We note that, if plaintiff submitted a revised progress schedule on September 15, it seems odd that the Army would be requesting another revised progress schedule less than two weeks later. It is also odd that plaintiff never later wrote the Army pointing to a previously-filed schedule. *See infra* note 13.

about the drainage trough. This letter informed plaintiff that it "must submit a written recommendation for either a standard industry repair o[r] replacement of the unsatisfactory trough wall." The letter also stated that "[a]ll delays associated with this poor quality control work are the responsibility of A.R. Contracting." The letter concluded by noting that there had been no action taken on the Army's requests in its September 29 letter regarding completion of certain work and the submission of installer qualifications.

On October 14, 1998, plaintiff responded to the Army's September 28 letter with two letters of its own. The letter contained allegations of government-caused delay in the project. These included the following:[12] (A) that the Army had made no determination regarding downspouts, area drains, and sump pumps; (B) that the Army had unilaterally determined that the completion date for the contract was June 17, 1998 when the contract's specifications had identified a completion date of August 31, 1998;[13] (C) that the Army had never responded to the July 23, 1998, list of "issues" to be either added to or deleted from the contract; (D) that the Army had refused to release necessary areas for concrete trough work; (E) that the Army had delayed in approving or disapproving submittals; (F) that the actual site conditions varied from those initially contemplated; and (G) that the Army had created a 140-day delay by "viewing Regis Contracting Co. as the Prime Contractor."

In its second October 14 letter, plaintiff stated that the contract contained "defective specifications" and that it required clarification of the contract. Plaintiff further alleged that it had presented these concerns to the government on prior occasions and not received any response. Specifically, plaintiff presented the following concerns:

A) What has been determined for downspouts, area drains and sump pumps[?]

B) Will there be any modifications in regards to concrete trough. There are no control joints or expansion joints in existing contract drawings. However, it has been the Government[']s recommendation to install control joints. Please clarify at what distance and provide a detail identifying start point and finish point of the control joint. . . .

C) The detail that is shown on the drawings regarding the 90 degree turns; w[h]ere the "loops" tie in, is in the path of several small trees and bushes. The Government needs to make the decision and take necessary action regarding these trees and bushes, because in August the Government took 21 days to determine that 1 tree could be cut.

D) Is the asphalt restoration in the schedule of values to be deleted under the storm sewer aspect of this contract?

E) A.R. Contracting Co. needs written direction in regards to point repairs.

Concluding, plaintiff stated that, "[u]pon receipt of the above necessary information a progress schedule will be submitted immediately."

The Army's response to the allegations contained in plaintiff's October 14 letters was not the next salvo in this escalating battle. Rather, on October 19, 1998, the Army sent plaintiff a letter notifying it that, due to its unsatisfactory progress and under the contract clause prescribed by FAR 52.232–5, the Army was withholding ten percent of all progress payments, beginning with progress payment number five. Then, on October 27, the Army sent plaintiff a response to a letter plaintiff evidently had sent the Army on October 19, 1998.[14] In its October 27 letter, the Army stated (1) that it had received no written response to the agenda it enclosed with its September 28 letter and (2) that it had not yet received the revised progress schedule it had requested for the second time in its September 28 letter.

---

**12.** For the sake of convenience, we adopt the lettered designations used by plaintiff in the letter.

**13.** We find it strange that, in this letter of October 14, plaintiff argued for an August 31 completion when plaintiff had allegedly submitted, on

September 15, a progress schedule containing a completion date of November 30.

**14.** This October 19 letter by plaintiff is not in the record.

The Army responded to plaintiff's October 14 letters on November 4, 1998. To differentiate between the two letters, the Army referred to the first letter quoted above as the "Work Effort Interruption and Interference" letter and to the second letter quoted above as the "Defective Specifications" letter. We will use the same nomenclature for the sake of convenience. The Army's letter specifically responded to each of the items contained in the two letters.

In response to the Work Effort Interruption and Interference letter, the Army first noted that on-site construction on the project did not begin until April 6, 1998. This was 108 days after the NTP. The Army went on to specifically address and reject each of plaintiff's allegations. The Army then noted that, because plaintiff had not identified any work interruptions or interference caused by the government or any work directed by the government that was beyond the scope of the contract, the government would assess liquidated damages in the amount of $370.00 per day from the contract completion date of August 31, 1998, until the project was completed.

The Army next addressed plaintiff's Defective Specifications letter. Again, the Army responded item by item and rejected each of plaintiff's contentions. The Army then concluded that plaintiff had identified no defective specifications in the contract and advised plaintiff that the contract start date, for purposes of the revised progress schedule, was December 19, 1997.

On November 13, 1998, nine days after responding to the allegations contained in plaintiff's October 14 letters, the Army sent two more letters to plaintiff. The first stated that plaintiff had not worked on the project site since October 21, 1998. The letter went on to state that this lapse of time meant that there had been thirteen no-work days for the period between October 22, 1998, and November 9, 1988, even though the weather had been clear. The letter also noted that the parties had met on October 29, 1998, and that, at this meeting, plaintiff's president had stated that work would resume on November 4. The Army then stated that work had not resumed on November 4 and that "lack of activity on the site continues to endanger your performance under this contract."

The second letter sent by the Army on November 13 was a Cure Notice. The Cure Notice listed five conditions "jeopardizing performance" of the contract and required that these conditions be cured within ten days after receipt of the notice. Failure to cure, the notice stated, could result in plaintiff's termination for default under the terms of the default clause of the contract. The five conditions listed in the Cure Notice were as follows: (1) "Failure to Complete Contract Work in a Timely Manner," (2) "Failure to Diligently Prosecute Work on the Drainage Trough," (3) "Failure to Submit Payroll Reports," (4) "Failure to Submit Contractor Quality Control Daily Report," and (5) "Failure to Provide Safe Working Conditions." The Cure Notice ended by stating that the Army's goal was "to complete all outstanding work under this contract to an acceptable level of quality, in the most efficient and safest manner possible" and that the Army believed that "this goal [was] still achievable, but only with your immediate attention to the serious deficiencies listed above."

Plaintiff acknowledged receipt of the Cure Notice in a letter dated November 18, 1998. In that letter, plaintiff asked that it be given until November 25, 1998, to respond, which it did. Plaintiff's response included a three-page attachment setting forth seven items in which plaintiff alleged problems with the contract and criticized the Army's administration of the contract: (1) Ambiguity in Initial Contract, (2) Government Imposed Delay in Work or Stop Work Order, (3) Government's Unreasonable Delay in Approving Documents, (4) Unreasonable Period of Suspension and Delay of Work by the Government, (5) Unauthorized Government Personnel Directing Contractor, (6) Instructed by Government Personnel to Perform Work Not in Contract, and (7) Defective Specifications and Misleading Information. Plaintiff's response did not include a revised project schedule or a proposed contract completion date.

In a letter dated December 7, 1998, the Army informed plaintiff that plaintiff's response to the Cure Notice was considered non-responsive and that, in the absence of

any further response by plaintiff, a recommendation would be made to issue a show cause notice regarding potential termination for default. Defendant alleges that the Army sent plaintiff a show cause notice on January 8, 1999, and that the Postal Service attempted to deliver this notice on at least four occasions. Plaintiff alleges that it did not receive this notice from the Army but instead received a copy from its bonding company on or about February 23, 1999. The Show Cause Notice included the same address as that contained in the Cure Notice.

In the January 8, 1999, Show Cause Notice, the Army acknowledged that plaintiff had taken corrective action in respect to items three and five of the November 13, 1998, Cure Notice. However, the Show Cause Notice went on to state that plaintiff had failed to respond to items one, two, and four. In light of this, the Army stated that the government was considering termination of the contract under the default clause. The Show Cause Notice also gave plaintiff the opportunity to present, within ten days of receipt of the notice, any facts on the question of whether its failure to perform "arose from causes beyond [its] control and without fault or negligence on [its] part."

Plaintiff made no response to the Show Cause Notice before the Army terminated the contract on February 4, 1999. In the letter of termination, the Army presented four findings of fact and six conclusions. The findings of fact were as follows: (1) that plaintiff had "failed to start and complete the work in accordance with" the contract's time requirements, (2) that plaintiff had "failed to diligently prosecute" work on the drainage trough, (3) that plaintiff had "failed to provide a proper Quality Control System," and (4) that plaintiff had "failed to properly maintain a Safety Program." After stating these findings, the termination letter then stated the Army's conclusions: (1) that plaintiff had been informed that its performance was unsatisfactory by the Cure Notice, (2) that plaintiff had "failed to supply a plan for bringing the contract into compliance," (3) that plaintiff was "sent a Show Cause Notice on January 8, 1999," (4) that plaintiff had "failed to present any facts to show that [its]

unsatisfactory performance on [the] contract was due to circumstances beyond [its] control," (5) that the Army's "written and verbal requests to submit a revised progress schedule ha[d] been ignored," and (6) that plaintiff's failures constituted inexcusable default of the contract that led the government to terminate plaintiff's right to proceed. In addition to terminating plaintiff's right to proceed, the government, as evidenced by a later letter to Congressman Benjamin A. Gilman, also ultimately withheld $190,920.00 in liquidated damages from plaintiff for its late performance.

On February 22, 1999, plaintiff responded to the Army's letter of termination. Plaintiff claimed that it had responded to the Cure Notice and that it had not received the January 8, 1999, Show Cause Notice. Plaintiff also alleged that it had "substantially complied" with the requirements of the contract and intended to "expeditiously complete" the contract work. Plaintiff further alleged that any "problems with compliance" had been beyond plaintiff's control.

Responding to this final letter by plaintiff, the Army stated, in a letter dated April 9, 1999, that plaintiff's "late response" to the Show Cause Notice had presented "no new relevant causes" why plaintiff's contract should not be terminated. In conclusion, the letter stated that there would be no change in the status of the termination for default.

## DISCUSSION

### I. Plaintiff's Motion for Summary Judgment

■ The basis for plaintiff's summary judgment motion is the contract clause set forth in DFAR 252.227–7003, Termination. In its proposed findings of fact, plaintiff states, "The [Termination] clause clearly states that 'the Government shall have the right to terminate .... by giving the Contractor not less than thirty (30) days notice in writing of the date such termination is to be effective ...'." Pl.'s Proposed Findings ¶ 67 (omissions in original). Plaintiff then asserts, "The Notice of Termination is dated only 26 days after the date of the Show Cause Notice (January 8, 1999) and does not

give AR Sales, the contractor, at least thirty (30) days notice of the date such termination was to be effective." Pl.'s Proposed Findings ¶ 69.

As is demonstrated by a comparison of ¶ 67 of plaintiff's proposed findings with the text of DFAR 252.227–7003, Termination, set forth in the background section of this opinion, plaintiff has omitted crucial language of this clause from its proposed finding. The full text reads,

> Notwithstanding any other provision of this contract, the Government shall have the right to terminate *the within license,* in whole or in part, by giving the Contractor not less than thirty (30) days notice in writing of the date such termination is to be effective; provided, however, that such termination shall not affect the obligation of the Government *to pay royalties* which have accrued prior to the effective date of such termination.

Pl.'s App. at 81 (emphasis added). This full quotation makes clear that DFAR 252.227–7003, Termination, does not prescribe the procedures for termination of the *contract* but rather prescribes the procedures for termination of a *license.*

Plaintiff would have us apply the plain language rule to its redacted version of DFAR 252.227–7003, Termination. However, we refuse to read the words "license" and "to pay royalties" out of the contract. Rather, because the contract contained no licensing agreement at all, DFAR 252.227–7003 is inapplicable. Plaintiff's Motion for Summary Judgment is denied.

## II.   Defendant's Motion for Summary Judgment

■   Defendant argues, on the basis of *Danzig v. AEC Corp.,* 224 F.3d 1333 (Fed. Cir.2000), that plaintiff's failure to provide a revised progress schedule and completion date suffices as justification for the termination for default. Plaintiff, however, contends that it could not provide the requested progress schedule and completion date because there were outstanding issues that needed to be resolved by the government. Defendant, in its proposed findings of fact, has not alleged that plaintiff's contention is untrue. Because defendant's proposed findings do not squarely address plaintiff's defense that it was impossible for it to respond fully to the Cure Notice, we are unable to grant defendant's Motion for Summary Judgment.

## III.   Defendant's Alternative Motion for Partial Summary Judgment

In the event we deny defendant's comprehensive motion for summary judgment, defendant has moved, in the alternative, for partial summary judgment on plaintiff's claim that the termination of the contract was procedurally defective. Defendant argues that the FAR did not require that plaintiff be sent a cure notice prior to termination and that, even if the FAR did so require, that defendant complied with the requirements of the FAR.

Defendant relies on FAR 49.402–3. That regulation, in pertinent part, provides:

> (c) .... In [the situations where the contractor has defaulted by failure to make delivery of the supplies or to perform the services within the specified time], no notice of failure or of the possibility of termination for default is required to be sent to the contractor before the actual notice of termination.... However, if the Government has taken any action that might be construed as a waiver of the contract delivery or performance date, the contracting officer shall send a notice to the contractor setting a new date for the contractor to make delivery or complete performance. The notice shall reserve the Government's rights under the Default clause.
>
> (d) .... If the termination is predicated upon [failure to make progress as to endanger performance of the contract or upon failure to perform some other provision of the contract], the contracting officer shall give the contractor written notice specifying the failure and providing a period of 10 days (or longer period as necessary) in which to cure the failure.... Upon expiration of the 10 days (or longer period), the contracting officer may issue a notice

of termination for default unless it is determined that the failure to perform has been cured.

FAR 49.402–3 (1998). The application of this section to the contract before us is unclear from the current record. Specifically, it is unclear whether, under the circumstances, this section required the Army to establish a new completion date because the Army had "taken an[ ] action that might be construed as a waiver of the contract delivery or performance date." Consequently, we do not rule on defendant's alternative motion for partial summary judgment at this time.

### IV. Defendant's Alternative Motion to Dismiss Count II

In its alternative Motion to Dismiss Count II of the Complaint, defendant moves to dismiss two claims contained in the complaint: (1) lost profits and (2) losses resulting from the "damage to its status as an approved contractor under Section 8(a) of the SBA." Comp. at 5–6. We grant defendant's motion in regard to both claims.

#### A. Plaintiff's Lost Profits Claim

■ Plaintiff cannot recover either lost profits it anticipated upon completion of the subject contract or lost profits it anticipated from other, unrelated contracts. It is well-settled that the presence of a termination-for-convenience clause "restricts the damages recoverable for [government] breach to those which would have been allowable under the convenience-termination clause, had it been invoked." *Inland Container, Inc. v. United States,* 206 Ct.Cl. 478, 490, 512 F.2d 1073 (1975) (citations omitted). Here, the termination-for-convenience clause only provided for "a reasonable allowance for profit on work done" in the event the contract was terminated for the government's convenience. FAR 52.249–2 I, Termination for Convenience of the Government (Fixed-Price) (1997). Consequently, plaintiff cannot recover the lost profits it anticipated making on the subject contract had the contract been completed, and its claim for those lost profits is hereby dismissed.

■ Plaintiff also cannot recover lost profits it anticipated to make from other, unrelated contracts. Lost profits on such contracts "constitute remote or consequential damages, and are not recoverable." *Kurz & Root Co., Inc. v. United States,* 227 Ct.Cl. 522, 531, 652 F.2d 69 (1981) (citing *William Green Constr. Co. v. United States,* 201 Ct.Cl. 616, 626, 477 F.2d 930, 936 (1973); *Dale Constr. Co. v. United States,* 168 Ct.Cl. 692, 738 (1964); *Ramsey v. United States,* 121 Ct.Cl. 426, 434, 101 F.Supp. 353 (1951)). Plaintiff's claim for such lost profits, therefore, is dismissed for failure to state a claim upon which relief can be granted.

#### B. Plaintiff's Damaged Business Claim

■ Plaintiff has requested judgment against the government for "damage [done] to its status as an approved contractor under Section 8(a) of the SBA." Compl. at 6. Furthermore, plaintiff alleges (1) that "[b]y reason of the Defendant's improper determination that the Plaintiff's contract should be terminated for default, the Plaintiff has been unable to participate in any further contract bidding under the Small Business Administration, SBA Section 8(a) program" and (2) that "Plaintiff's status as an approved Section 8(a) contractor has been damaged as a result of Defendant's acts and further Defendant has interfered with Plaintiff's ability to graduate from the Section 8(a) program so that it may bid on other government contracts." Compl. ¶¶ 26, 27.

Plaintiff has identified no contractual provisions that would grant it a right to recover damages (1) for the alleged injury done to its "status" as a Section 8(a) contractor, (2) for the alleged injury done to its ability to participate in future SBA contract bidding, or (3) for the alleged injury done to its ability to graduate from the Section 8(a) program. Any claim for these enumerated damages sounds in tort. Because this court does not possess jurisdiction over tort claims, *see* 28 U.S.C. § 1491(a)(1) (1994) ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States . . . in cases not sounding in tort"); *Shearin v. United States,* 992 F.2d 1195, 1197 (Fed.Cir.1993), we dismiss plaintiff's damaged business claim for lack of jurisdiction.

## CONCLUSION

The caption is amended to read as follows: A.R. Sales Co., Inc., d/b/a A.R. Contracting Co. v. The United States. Plaintiff's Motion for Summary Judgment is denied. Defendant's alternative Motion to Dismiss Count II of the Complaint is granted. During oral argument, the court indicated that supplementation was necessary in order to resolve defendant's Motion for Summary Judgment and alternative Motion for Partial Summary Judgment. Those motions remain pending.

Defendant is directed to file a supplemental brief, limited to fifteen pages, addressing, at a minimum: (1) plaintiff's argument that it was unable to fully respond to the Cure Notice and (2) the applicability and legal effect, in light of this opinion, of FAR 49.402–3. Defendant shall also submit supplemental proposed findings of fact in regard to plaintiff's contention that it was unable to fully respond to the Cure Notice. Defendant's supplemental papers shall be filed on or before August 2, 2001. Plaintiff's response shall be filed on or before August 23, 2001. Plaintiff's supplemental papers shall include a responsive brief, limited to fifteen pages, and a statement of genuine issues responding to defendant's supplemental proposed findings of fact. Defendant's reply shall be filed on or before September 3, 2001.